## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**MARK L. EHRMAN,**
**VIÑAS ARGENTINAS LLC, and**
**VIÑA MAIPÚ SRL,**

**Plaintiffs,**

**v.**

**LEANDRO MAIFREDINI,**
**JUAN PABLO MAIFREDINI,**
**ROMULO MAIFREDINI,**
**LEANDRO DE LA FUENTE,**
**OSCAR IRUSTA,**
**MARA DESIMONE MARTIN, and**
**POLIBOL S.A.,**

**Defendants.**

## COMPLAINT[1]

## NATURE OF THE ACTION

1.      Beginning no later than April, 2005 and continuing through no earlier than

January, 2008 and believed and, therefore alleged, to be continuing until the present, the

defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, Mara

Desimone Martin, Oscar Irusta, and Polibol S.A., ("Defendants") associated together and

conspired for the purpose of planning and executing a broad scheme to defraud American

citizens and others individuals and business foreign to Argentina, including, but not

---

[1] This Complaint is supported by a set of Exhibits for which an Index is attached at the end of this document.

limited to the Plaintiffs in this action, and to convert money and property entrusted to the Defendants to their own use and benefit (the "Fraudulent Scheme")

2.      In the course of planning, executing and furthering their fraudulent scheme, the Defendants established and maintained an association which engaged in and affected interstate and foreign commerce by targeting and contacting foreign nationals, including American citizens, purporting to befriend them, inducing their trust and confidence, and soliciting them to make financial investments in various Argentine business ventures which the Defendants identified and falsely purported to independently evaluate.

3.      As part of and in furtherance of the Fraudulent Scheme, the Defendants induced their targets to entrust the selection, management, and control of such investment opportunities to the Defendants, and then usurped control of those ventures in order to defraud their targets of the proceeds and fruits of their investments.

4.      In so doing, the defendants targeted and contacted American citizens whom they believed to be of financial means, purported to befriend them, falsely exaggerated and extolled their own skills and experience, falsely misrepresented their altruistic motivation, solicited their targets to make investments in Argentine business ventures, engendered their targets' trust and confidence, and promised to identify, execute, manage and safeguard their targets' investments in Argentina, and then usurped control over such investments for purposes of defrauding their targets of money and property.

5.      In furtherance of the foregoing scheme, each of the defendants transmitted numerous interstate and foreign electronic mail messages and initiated countless

telephone calls in foreign and interstate commerce to their intended victims and thereby supplied them with false and misleading information concerning the condition, status, economic viability, and performance of Argentine based investment opportunities.

6.      In perpetration of the foregoing scheme, the Defendants induced the Plaintiffs Mark L. Ehrman ("Ehrman"), Viñas Argentinas, LLC, and Viña Maipú, SRL, and into making a series of financial investments in Argentine business and real estate ventures and induced the Plaintiffs to entrust the management and oversight of such investments to the Defendants, by contacting and communicating with the Plaintiff Ehrman by interstate and international telephone and electronic mail, engendering his trust and confidence.  Having induced the Plaintiffs to entrust the oversight and management of their business investments to the Defendants, the Defendants systemically converted those investments and the fruits thereof to their use and benefits in the execution of a conspiracy which took place in and affected interstate and foreign commerce, inducing him to make several financial investments in Argentine real estate and businesses, usurping control over the investments, making false representations concerning the viability, status, and performance of such investments, and, at all times, concealing relevant factual information concerning the same.

## PARTIES

### PLAINTIFFS

7.      The plaintiff Viñas Argentinas, LLC ("Viñas Argentinas") is a Limited Liability Company organized under the laws of the Commonwealth of Massachusetts, with a principal place of business located at 159 Beacon Street, Boston, Massachusetts, which was established for the purpose of making international investments in foreign properties and businesses and transacting business in interstate and foreign commerce.

8.      The plaintiff Mark L. Ehrman ("Ehrman") a natural person residing at 159 Beacon Street, Boston, Massachusetts.  Ehrman is the beneficial owner of Viñas Argentinas.

9.      The plaintiff Viña Maipú SRL ("Viña Maipú") is an Argentinean Sociedad de Responsabilidad Limitada ("SRL"), i.e. a corporation organized under the laws of Argentina, with a principal place of business at 11382 Perito Moreno, Fray Luis Beltran, Maipú Mendoza, Republica Argentina.  At all times relevant and material hereto, Viña Maipú was a Sociedad Anonima but was converted to its current status as an SRL in December 2008.  At all times relevant and material hereto, Viña Maipú made wine and sold the wine in the United States and in other countries and engaged in foreign and interstate commerce including the transaction of business in the United States.

## DEFENDANTS

10.     The defendant Leandro Maifredini ("Leandro") is a natural person who is a resident of La Plata, Argentina.

11.     The defendant Juan Pablo Maifredini ("Juan Pablo") is a natural person and a resident of La Plata, Argentina.

12.     The defendant Romulo Maifredini aka Cholo ("Romulo") is a natural person and a resident of La Plata, Argentina.

13.     The defendant Leandro de la Fuente ("de la Fuente") is a natural person and a resident of La Plata, Argentina.  De la Fuente is Leandro's brother-in-law.

14.     The defendant Mara DeSimone Martin ("Martin") is a natural person, a cousin of Juan Pablo and Leandro and niece of Romulo, and is a native of La Plata,

Argentina, who currently resides at 88 Charles East, No. 210, Toronto, Ontario, Canada M4Y2W7.

15.     The defendant Oscar Irusta ("Irusta") is a natural person who is a resident of Mendoza, Argentina.

16.     The Defendant Polibol S.A., ("Polibol") is an Argentinean Sociedad Anonima ("S.A."), i.e. a corporation organized under the laws of Argentina with a principal place of business in La Plata, Argentina.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this matter pursuant to 28 USC § 1332(a)(2), as this matter in controversy exceeds the sum of $75,000 and is between citizens of a State, i.e. Massachusetts, and citizens or subjects of a foreign state, to wit, Argentina.

18.     Additionally, this court has jurisdiction over this matter pursuant to 28 USC § 1331, as claims asserted herein arise under the laws or treaties of the United States, and on the further ground of 18 USC § 1965(c) as some of the claims allege violations of 18 USC § 1962.

19.     Venue is proper pursuant to 28 USC § 1391(d) which provides, in pertinent part, that an alien may be sued in any district.

## FACTS COMMON TO ALL COUNTS

### DEFENDANTS ESTABLISHED AND MAINTAINED AN ASSOCIATION IN FACT WITHIN THE MEANING OF 18 U.S.C 1961(4)

20.     At all times relevant and material hereto, the Defendants Mara Martin, Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini and Leandro de La Fuente were and are all members of an extended biological family, the paternal head of

which is Romulo.  Romulo Maifredini is Leandro Maifredini's father, and is uncle to Juan Pablo Maifredini and Mara Martin.  Leandro Maifredini, Juan Pablo Maifredini, and Mara Martin are cousins.  Leandro de la Fuente is married to Leandro Maifredini's sister and is, therefore, Leandro's brother-in-law and Romulo's son-in-law.

21.    The defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini and Leandro de la Fuente, are hereinafter collectively referred to variously as the "Maifredinis" or the "Maifredini Defendants."

22.    Polibol is a "family business" in that it was, at all times material hereto, wholly owned, operated and controlled by the Maifredini Defendants.  More particularly, Romulo Maifredini, Leandro Maifredini, Juan Pablo Maifredini and Leandro de la Fuente were and, on information and belief, continue to be, employees of Polibol occupying senior executive management positions in the company.  At all times, Leandro Maifredini, Juan Pablo Maifredini, and Romulo Maifredini acted on behalf of Polibol as its officers and agents with actual or apparent authority and within the scope of their authority and employment by Polibol.

23.    In furtherance of the fraudulent scheme, the Maifredini Defendants arranged for Polibol to dedicate office space within its Argentine headquarters as the location in which to maintain and store files and manage and coordinate the financial affairs of the business ventures in which the Defendants induced the Plaintiffs to invest, as more fully described herein.

24.    The defendant Oscar Irusta is a childhood friend of Romulo and was at all times material hereto a long standing trusted friend and confidant of the Maifredini

family.  Irusta shared the same intent and objectives as the Maifredini Defendants and faithfully did their bidding.

25.     As more fully set forth herein, at paragraphs 163 through 254 of this complaint, the Maifredini Defendants installed Irusta as their representative and agent in Mendoza, Argentina to oversee day –to-day operations of the winery business venture they induced the Plaintiffs to acquire and finance.  By his own admission, although Irusta assumed charge of the day-to-day affairs of the winery, he took direct orders on every major issue from Leandro and Juan Pablo Maifredini.  Through Irusta, Leandro, Juan Pablo, Romulo and Polibol maintained continual contact with and usurped control over the winery business venture, converting the Plaintiffs' investment therein to their own use and benefit.

26.     At all times prior to, during and after the events material hereto, Romulo, Leandro, Juan Pablo, de la Fuente, Irusta, Martin and other Polibol employees and Maifredini family members communicated and collaborated with one another on a regular basis, both in person face to face meetings and by using Internet based electronic mail messaging and using Polibol's Internet Domain Name and Electronic Mail accounts as more fully described herein.  In addition, the Maifredini Defendants, Martin, and Irusta also used cellular telephone communications media for purposes of communicating among themselves.  The Defendants used such communications media for purposes of furthering their goals and objectives of defrauding Ehrman, Viñas Argentina, Viña Maipu, Ehrman's other business investment entities and other foreign nationals.

27.     In furtherance of the conspiracy, Mara Martin's role was and continues to be to identify and falsely purport to befriend potential victims, introduce them to

Leandro, Juan Pablo, Romulo and other members of the Maifredini family and organization, to falsely extol their skills, accomplishments, motivation and business acumen of the Maifredini Defendants, and participate with them in soliciting and inducing such targets into making financial investments in Argentina, and entrusting the oversight and management of such investments to the Maifredini defendants in order that the Defendants could defraud the victims of such investments in furtherance of their fraudulent scheme as herein described.

28.    In the conduct of the Fraudulent Scheme, the Defendants engaged in conduct which took place and/or affected foreign or interstate commerce in that they transmitted telephone and electronic mail messages from Argentina and other foreign countries into the United States across international and interstate boundaries, solicited and induced investments from American citizens using interstate and international electronic mail facilities, solicited and received funds transmitted from the United States by wire transfers from United States banks in Massachusetts and New York into bank accounts located in Florida, Argentina and the Bahamas, defrauded the Plaintiffs of money and property, and applied the fruits thereof to supporting the international promotion, marketing and sales activities of the Defendant Polibol.

29.    The Defendants planned and executed the foregoing fraudulent scheme and conspiracy in violation of RICO, 18 USC § 1961 et seq. and in commission of various common law torts including fraud and deceit, conversion, money had and received, unjust enrichment, breach of contract, and breach of fiduciary duty, all as more particularly alleged herein.

**PATTERN OF RACKETEERING ACTIVITY**

30.     In the course of and in furtherance of their conspiracy and fraudulent

scheme, during the period from April 2005 through December 2007, Defendants engaged

in a pattern of racketeering activity within the meaning of 18 USC § 1961 by initiating

and transmitting countless interstate and international communications with Ehrman and

other targets from Argentina and other foreign countries and directing such

communications into the United States using the United States wire communications

services including wired and wireless telephone communications facilities, Internet based

voice-over-Internet protocol telephone communications facilities, SMS text messaging,

and Internet based electronic mail message systems.

31.     More particularly with regard to their use of electronic mail, beginning no

later than early 2005, each of the defendants Leandro, Juan Pablo, De la Fuente, Martin,

Irusta, and Polibol transmitted numerous electronic mail messages ("e-mail" or "e-mail")

in foreign commerce from locations in Argentina and Canada and other foreign countries,

into the United States and other countries which they directed to Plaintiffs and other

potential targets as such were located in the United States as more particularly set forth

and described herein.

32.     In furtherance of their fraudulent scheme, the Defendants Leandro, Juan

Pablo, De la Fuente, and Martin initiated countless face-to-face communications, cellular

phone communications, and electronic mail communications not only with the Plaintiff

Ehrman, but also a number of Ehrman's friends and business associates in attempts to

induce them, as well, into making investments in Argentina which the Defendants

planned and intended to convert to their own use and benefit in furtherance of their

fraudulent scheme as more fully set forth herein.  During the period of 2005 through 2007, others to whom the Defendants made overtures include but are not limited to Douglas M. Ferguson, of Newton, Massachusetts, Ferguson's father  James Ferguson of Charleston, South Carolina,  Jonathan Davis of Chestnut Hill, Massachusetts, Jose' Francisco Portuondo of Newton, Massachusetts, Nicholas and Sheila Smithie then of Boston, Massachusetts, Bertil Jean Chronberg of Boston, Massachusetts, Donald Lessem of Media, Pennsylvania, Jon Staenberg of Rustic Canyon Partners, a venture capital firm located in Seattle, Washington, and Matt Pascucci of Swampscott, Massachusetts, and Thomas and Reece Tisdale, of South Carolina.

33.     Each of the Defendants initiated such electronic and telephone communications in both foreign and interstate commerce within the meaning of 18 USC §1443 as the Defendants initiated numerous such telephone and electronic mail transmissions from Argentina, Canada, and other foreign nations and directed such communications across international and interstate boundaries into Massachusetts and other locations in the United States.

34.     In furtherance of the fraudulent scheme, the defendants Leandro Maifredini, Juan Pablo Maifredini, Leandro De La Fuente, Oscar Irusta, Mara Martin, and employees of the Defendant Polibol and those of a joint venture they formed under the name Partner Finder, the defendants and their agents acting under the control and direction of the defendants, employed a variety of email accounts at Polibol, Bandex, Viña Maipu, RIM Blackberry, Microsoft Hotmail, Yahoo, and others to transmit in excess of one thousand eight hundred (1,800) electronic mail messages for purposes of communicating false information and misrepresentations through which they induced

Ehrman and, through him, other plaintiffs, into making and entrusting to them various investments, usurping and exerting dominion and control over those investments and related entities and property, converting the same to their own use and concealing the fact and extent of their fraud from the Plaintiffs, all in violation of 18 USC § 1343 and RICO, 18 USC §§ 1962(a)-(d).

35.     Attached hereto and incorporated herein by reference as **Exhibit A-1** is a schedule reflecting the email accounts used by each of the defendants and those of their agents and employees at Polibol and Partner Finder, i.e. Bandex, in furtherance of the fraudulent scheme as herein alleged.  **Exhibit A-1** also reflects the number of email messages transmitted from each email account by each of the defendants to Ehrman, other potential targets, to some third parties and among one another in furtherance of the fraudulent scheme.

36.     Attached hereto as **Exhibit A-2** is a consolidated list of over 1,800[2] of the electronic mail messages which the Defendants and their employees and agents transmitted during the course of and in furtherance of the fraudulent scheme.  Over 1,600 of the listed messages were sent to Ehrman.  The details and contents of the listed messages are set forth in the **Exhibits Categories B through H**,[3] (more particularly in **Exhibits B-2, C-2, D-2, E-2, F-2, G-3, and H-2**) which are attached hereto and incorporated herein.

---

[2] As many of the e-mail messages sent by the defendants were transmitted to multiple e-mail addresses, there are duplicates in this inventory.
[3] The term "Exhibit Categories" shall be used throughout the Complaint to refer to the groups of Exhibits under the various alphabetical designations.  E.g.  Exhibit Category B shall refer to Exhibits B-1 and B-2.

37.     In **Exhibit A-2** and in other of the exhibits referenced herein, each e-mail message is identified by a unique Identification Number designated herein as "ID", "ID No." or "E-mail ID No."

38.     The e-mail messages identified herein and in the Exhibits constitute but a subset of those transmitted by the defendants in furtherance of the fraudulent scheme to the extent at this time known to the Plaintiffs.

39.     As more particularly described in the following paragraphs, in the course of so doing, the defendants transmitted e-mail messages to Ehrman who used the following e-mail accounts based at facilities in the United States: docmark@tmo.blackberry.net, xdocmark@mac.com, xdocmark@gmail.com, and xdocmark@rcn.com.

40.     More particularly, as summarized in Exhibits A-1 and A-2, at all times relevant and material hereto, the Defendant Leandro Maifredini, acting for himself and as an executive and employee of Polibol, used Polibol's office facilities and Internet Domain electronic mail account at polibol.com.ar and electronic mail accounts which included, but are not limited to  the following e-mail addresses and variations thereof: "Maifredini, Leandro" "Leandro Maifreddini" or "Leandro Maifredini" lm@polibol.com.ar, "Blackberry Leandro" or "Leandro Blackberry" leandro@tmo.blackberry.com; and "Maifredini, Leandro" Leandro@maipuwines.com.

41.     Utilizing the foregoing accounts and addresses, Defendant Leandro Maifredini transmitted over nine hundred e-mail messages in foreign and interstate commerce from Argentina to the Plaintiff Ehrman in the United States and to other targets of the fraudulent scheme also located in the United States and other countries.  A

schedule reflecting the dates, times, originating e-mail accounts, recipient e-mail addresses, and the subjects of some but not all e-mail messages transmitted by Leandro in furtherance of the fraudulent scheme is attached as **Exhibit B-1.**

42.     Leandro transmitted in excess of 800 e-mail messages using the address of lm@polibol.com.ar which he originated from the Defendant Polibol's offices and e-mail server in La Plata Argentina using Polibol's Internet Domain Name and associated electronic mail account of "polibol.com.ar."  Those e-mail messages originated by Leandro using the mail account of "leandro@maipuwines.com" originated from the Plaintiff Viña Maipu's offices in Mendoza, Argentina.  The majority of the messages initiated by Leandro using the Leandro@tmo.blackberry.com" account originated in either Argentina or other foreign nations and were directed to recipients in the United States and travelled in either foreign commerce or in American interstate commerce.

43.     Set forth in **Exhibit B-1** is a print out of approximately 900 of the e-mail messages transmitted by Leandro in furtherance of the fraudulent scheme reflecting the date, time, e-mail account, recipients and contents of the messages, absent the contents of any attachments thereto.

44.     For his part, as reflected in Exhibit A-1, in execution of the scheme to defraud, the Defendant Juan Pablo Maifredini, acting for himself and as an executive and employee of Polibol, used Polibol's office facilities and Internet Domain electronic mail account and addresses at "Juan Pablo Maifredini  juanpablo@polibol.com.ar," and "Maifredini, Juan Pablo juanpablo@polibol.com.ar", a further e-mail account and address at: "Maifredini Juan Pablo jmaifredini@bandex.com," another at juanpablo@maipuwines.com and others to transmit approximately 290 e-mail messages

from Argentina to recipients in foreign commerce such as Ehrman and others in the United States.  A schedule reflecting the Email ID Number, dates, times, originating e-mail accounts, recipient e-mail addresses, and subject matter of some of the e-mail messages transmitted by Juan Pablo in furtherance of the fraudulent scheme is attached as **Exhibit C-1.**  A printout reflecting the E-Mail ID number, dates, times, originating e-mail account, addressee e-mail account, subject and contents of those e-mail messages, absent their attachments, is attached as **Exhibit C-2.**

45.     In furtherance of the fraudulent scheme, the Defendant Leandro De la Fuente used the email accounts and addresses reflected in Exhibit A-1, including an e-mail account with an address of "De la fuente, Leandro" dlfarquitectura@yahoo.com.ar from which he transmitted approximately seventy messages in foreign commerce from Argentina into the United States.  A schedule reflecting the dates, times, originating e-mail accounts, recipient e-mail addresses, and subject matter of some of the e-mail messages transmitted by de la Fuente is attached as **Exhibit D-1.**  A printout reflecting the foregoing information plus the contents, but not the attachments, of those e-mail messages is set forth in **Exhibit D-2.**

46.     In furtherance of the fraudulent scheme, as more particularly described herein, the Defendant Mara Martin utilized electronic mail accounts and addresses identified in **Exhibit A-1**, including but not limited to those of "Mirta Martin" mima_martin@hotmail.com and "Marita" maragem@pathcom.com to send electronic mail messages in foreign commerce from Canada to Ehrman and others in the United States.  From 2005 through 2007, Martin transmitted approximately fifty such messages to Ehrman and others.  A schedule reflecting the ID Number, date, time, originating e-

mail account, recipient e-mail addresses, and subject matter of some of the e-mail messages transmitted by Martin in furtherance of the fraudulent scheme is attached as **Exhibit E-1.**  A printout reflecting the details and contents of those messages is set forth in **Exhibit E-2.**

47.     In furtherance of the fraudulent scheme, as more fully set forth herein, the Defendant Oscar Irusta used electronic mail accounts set forth in **Exhibit A-1** and, more particularly, those at the addresses of: "ork08@arlinkbbt.com.ar", vinamaipu@arnet.com,ar and "Oscar Irusta" **gerencia@maipuwines.com** to send no less than 195 e-mail messages in furtherance of the fraudulent scheme from locations at Viña Maipu and other locations in Argentina, no less than fifteen of which he sent in interstate or foreign commerce from Argentina to Ehrman or Jose' Portuondo in the United States. A schedule reflecting the ID Number, date, time, originating e-mail account, recipient e-mail addresses, and subject matter of e-mail messages transmitted by Irusta in furtherance of the fraudulent scheme is attached as **Exhibit F-1.**  A printout of that same information plus the contents of those messages, absent attachments, are set forth in **Exhibit F-2.**

48.     In furtherance of the fraudulent scheme, Leandro Maifredini, Juan Pablo Maifredini, and Romulo Maifredini employed the resources, employees, and electronic mail accounts of Polibol at polibol.com.ar and Bandex, bandex.com.ar, in furtherance of the fraudulent scheme herein alleged.  More particularly, the defendants Romulo Maifredini, Leandro Maifredini, and Juan Pablo Maifredini caused and/or directed themselves and other employees and agents of the Defendant Polibol and a joint venture partner at Partner Finder using the domain name bandex.com.ar to transmit approximately 1,147 e-mail messages in foreign and/or interstate commerce.

Approximately 375 e-mail messages were transmitted in interstate or foreign commerce from Argentina to addressees in the United States and other nations by employees or agents of Romulo, Leandro, Juan Pablo and Polibol and Bandex who included but were not limited to the following:  Lucas Puertas, Andrea Cuello, Picardo Esteban, Agostina Nagaglia Maifredini, Nicolas Sredkoff, Cynthia Acosta, Jorge' Di Giano, and Angela Volpicelli.  Attached as **Exhibit G-1** is a schedule reflecting the ID number, date, time, originating e-mail account, recipient e-mail addresses, and subject matter of some of the e-mail messages transmitted in furtherance of the fraudulent scheme from Polibol using Polibol's Internet Domain Name and email account of "polibol.com.ar" and that of the Bandex e-mail account at bandex.com.ar   Attached at **Exhibit G-2**, is a schedule of email messages sent by employees or agents of Polibol in furtherance of the fraudulent scheme and attached at Exhibit **G-3** are printouts of the details and contents of those messages. Over 800 of the messages transmitted from the polibol.com.ar and bandex.com.ar email accounts were directed to Ehrman and other foreign targets of the fraudulent scheme.

49.     In furtherance of the fraudulent scheme to identify, contact and solicit investments from and defraud other potential targets, the Maifredini Defendants, and, in particular, Defendant Leandro Maifredini, and, at his direction, Polibol employee Lucas Puertas sent e-mail messages in foreign or interstate commerce from Argentina to Douglas Ferguson in the United States.  The messages contained both content and attachments setting forth financial information and financial projections in an attempt to induce Ferguson, some of his family members, and other of Ferguson's contacts and associates to invest in the Argentine wine industry generally and, in particular, Viña

Maipu and other wineries, for purposes of furthering the fraudulent scheme.  Attached at

**Exhibit H-1** is a schedule reflecting the e-mail ID, date, time, originator, recipients, and

subject of approximately 65 such e-mail messages sent by the defendants from Argentina

to Douglas Ferguson and Jon Staenberg located in the United States at Newton,

Massachusetts and Seattle, Washington, respectively. The details and contents of the

foregoing messages, absent their attachments, are set forth in **Exhibit H-2.**

50.     In furtherance of the fraudulent scheme, the defendants Romulo

Maifredini, Leandro Maifredini, Juan Pablo Maifredini, and De la Fuente, individually

and collectively, solicited and induced Ehrman into sending money from Bank Accounts

in the United States to Bank Accounts under their control in Argentina, Florida, Bahamas

and Uruguay  in order to fund the business ventures they induced him to make in

Argentina and to fund expenses associated with those business, all as more particularly

described herein.  One example of such "wire transfer instruction" is contained in Email

ID 7899, dated 2/15/07 from Leandro to Ehrman.  See **Exhibits B-1, B-2.**

51.     In reliance upon numerous representations which the Defendants made to

Ehrman both orally, in phone conversations, and in the e-mail messages identified herein,

which are more particularly described in the following paragraphs, and based on

instructions the defendants sent to him by e-mail, many but not all of which are contained

in the E-Mail Exhibits, the Plaintiffs, through Ehrman, executed in interstate and/or

foreign commerce over twenty-five "wire transfers" of funds from bank accounts in

Massachusetts and New York to bank accounts in Argentina, Bahamas, Florida, and other

foreign jurisdictions in order to fund the acquisition and operation of ventures into which

the defendants induced Ehrman to invest in furtherance of the fraudulent scheme.

52.     As a proximate result of the Defendants' fraudulent scheme, the wire transfers executed by Ehrman in interstate or foreign commerce amounted to approximately $2.5 million in United States dollars ("USD").

53.     Attached hereto as **Exhibit I** is a list of the wire transfer transactions which Ehrman initiated from Massachusetts or New York and by which he transferred funds in interstate and foreign commerce to bank accounts owned or controlled by Defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, and Polibol located in Argentina, Miami, Florida, Montevideo, Uruguay, and Bahamas.  The list reflects the date, point of origin, the location of the destination bank, wiring instructions the Defendants sent to Ehrman, the amount of such transfers.  Each such wire transfer is identified by a unique Wire Transaction Number denominated "Trans No" on the schedule and a brief description of the purported purpose of the transfer.  (Bank account numbers have been sanitized to reflect only the last four digits of the account number.)

54.     In advance of the wire transfers, the Maifredini defendants transmitted e-mail messages to Ehrman supplying him with wire transfer instructions including routing numbers and destination bank accounts.  See, for example, **Exhibit B-2**, Email ID No. 1233, dated 12/7/2005, from Leandro to Ehrman, detailing such instructions.

55.     In furtherance of the fraudulent scheme, the Maifredini defendants also solicited Ehrman to transfer funds to Argentina by sending Ehrman, by email, lists of expenditures for which they claimed entitlement for reimbursement. Such requests were typically sent by Lucas Puertas at the direction of the Maifredini defendants.  Examples include, but are not limited to: Email ID 6742, from Lucas Puertas to Ehrman and others, dated 11/21/06; Email ID 7293, from Lucas Puertas to Ehrman, dated 2/22/07; Email ID

8905, from Lucas Puertas to Ehrman, dated 3/20/07; Email ID 9409, from Lucas Puertas to Ehrman, dated 04/19/07.  See **Exhibits G-2, G-3**.  Ehrman relied upon the purported accuracy of these expense reports in paying them.

## UNITED STATES NEXUS

56.     In addition to transmitting numerous electronic mail messages into the United States, in the course of and in furtherance of their fraudulent schemes and conspiracy, between April 2005 and December 2007, the Defendants, directly or indirectly, attended numerous face-to-face meetings with Ehrman, and other potential victims, in Newton, Massachusetts, Boston, Massachusetts, Sunapee, New Hampshire, in other locations in the United States and Canada, as well as in numerous other jurisdictions including Argentina and Uruguay.

57.     On information and belief, at all times relevant and material hereto, Polibol and its partner, Bandex, routinely engaged in foreign commerce and routinely transacted foreign commerce within the United States and many other countries.  Polibol purchases products for distribution from suppliers based in the United States.

58.     More particularly, in furtherance of the fraudulent scheme, Leandro Maifredini visited Ehrman in Newton, Massachusetts in June of 2005 and used the opportunity to ingratiate himself with other potential American targets, and extol what he alleged to be economic benefits of Ehrman and others making financial investments in the Argentine wine and real estate industries under the Maifredinis' tutelage.  Leandro then travelled to Lake Sunapee, New Hampshire where he met with other "potential investors" in an effort to induce them into making investments in the Argentine wine and real estate industries.  On the same occasion he accompanied Ehrman to Montreal,

Canada, where they met with Mara Martin in order to continue their efforts to induce Ehrman to make investments in Argentina.

59.     In addition, in furtherance of the fraudulent scheme, the Maifredini Defendants maintained at least one or more bank accounts at Banco Santander Center Hispano Internacional, located at 1401 Brickell Avenue Suite 1500, Miami Florida 33131.  In response to instructions which the Defendants transmitted to Ehrman by international electronic mail, the Plaintiffs sent wire transfers of funds to that account, as more particularly described herein.  See **Exhibit I, Wire Transfer Numbers 10, 13, 17, 18, 19, and 22.**

## DEFENDANTS' INITIAL INTRODUCTION AND FALSE REPRESENTATIONS REGARDING THEIR PROFESSIONAL COMPETENCE AND PERSONAL MOTIVATION:

60.     Beginning no later than in 2005, and at all times relevant and material hereto, defendant Mara Desimone Martin falsely held herself out to Ehrman as a licensed investment adviser and as a business consultant in both Canada and Argentina.  In the course of so doing, Martin claimed that she devoted substantial time each weekday and weekends to soliciting business referrals from citizens of Canada, United States, and Europe and that she had extensive experience in recommending, advising, selecting and securing successful real estate and other business investments in Canada and in Argentina.

61.      In fact Martin was never licensed as an investment adviser in Canada or elsewhere and she lacked a track record of having made investment recommendations which had proved successful.

62.     During the period from April 2004 through 2007, in furtherance of the conspiracy among all the Defendants, Martin repeatedly solicited Ehrman by means of and through communications in the form of letters and cards sent through the United States Postal Service, international telephone calls and electronic mail messages over the Internet and wire communications channels, and personal face-to-face meetings in the United states and Canada through which she urged Ehrman to make financial investments in Argentina with and based upon her advice and assistance and with that of the other Defendants with whom she conspired.  Martin amplified and repeated these efforts in the e-mail messages set forth in **Exhibits E-1 and E-2.**

63.     Martin did so under the false pretense of personal friendship and loyalty to Ehrman expressed both in person and in the content of numerous electronic mail messages exchanged with Ehrman.

64.     In May 2005, at Martin's continued urging, Ehrman traveled to Argentina to meet Martin's associates and view some potential investment opportunities.

65.     Based on defendant Martin's false representations that she was a licensed investment advisor who had Ehrman's personal best interests at heart, and that her "team" had identified legitimate and highly selective investment opportunities, Ehrman paid Martin a fee and reimbursed her for expenses in the amount of $3,909.88 USD.

66.     In furtherance of the conspiracy, from May 23 through May 28, 2005 Martin escorted Ehrman to various locations in Buenos Aires and in La Plata, Argentina and there Martin introduced Ehrman to the Defendants Leandro, his cousin Juan Pablo, Romulo, and Leandro's brother-in-law de la Fuente.

67.     The Maifredinis immediately ingratiated themselves with Ehrman, invited

him to their homes, escorted him to sites in Buenos Aires and La Plata, and introduced

him to their company, Polibol.  Over the course of Ehrman's May 2005 visit, the

Maifredinis convinced Ehrman of their friendship and trustworthiness.  From May 2005

until 2008, the Maifredinis continued to hold themselves out as trustworthy friends to

Ehrman, including by hosting Ehrman, his wife and children at their home during his

trips to Argentina.

68.     As an example, Leandro sent Ehrman an email message on August 25,

2005 in which, as translated, he stated in relevant part, "Dear Mark:  In the first place I

would like to tell you as always that it has been a pleasure to be able to converse again

with you. Honestly, it is difficult to explain, but I feel very comfortable with you as if we

had known each other for an entire lifetime, and this I believe you will notice how I try to

explain it to you."  I hope with my heart that we can soon begin a voyage together and

that it can be as prolonged as possible. I again reiterate that I am ready, able, and hoping

to begin.     See Email ID No. 883, **Exhibit B-2.**

69.     In furtherance of the conspiracy, Martin falsely represented to Ehrman that

the Maifredinis were competent, experienced, trustworthy, professional, and willing to

advise and assist Ehrman in locating, evaluating, selecting, purchasing, managing and

economically developing sound investment opportunities in Argentina.  She further

claimed that the Maifredinis had a track record of unblemished success in performing

such services for other investors.  Martin falsely represented the foregoing parties as her

"team" of advisers and consultants, that they were assembled for the purposes of

assessing potential investment opportunities for Ehrman, that Ehrman could rely on them

for business advice in Argentina, and that they acted on Ehrman's behalf and independent of selfish motive or desire for personal gain.

70.     More particularly, Martin falsely informed Ehrman during this period that this "team" would advise and assist Ehrman acting in Ehrman's interest to help him to make solid and profitable business investments in Argentina while preventing Ehrman from becoming prey to the dishonesty and corruption to which foreign investors were often vulnerable in Argentina.  In addition, Defendant Martin falsely vouched for the honesty and competency of the selected people whom she had introduced to Ehrman.

71.     In the course of her communications with Ehrman and as part of their the fraudulent scheme, Defendant Martin falsely represented that the principal motivation of the members of her "team" (meaning the defendant members of her extended family) in assisting Ehrman was their interest in meeting people from other countries, introducing people to Argentina to promote Argentine development and progress, and their purported interest in North American culture and business methods.  Martin falsely represented that the Defendant members of her family had no personal or selfish financial or economic motive in Ehrman's potential Argentine business ventures as they owned and controlled substantial businesses and had ample funds of their own.  The foregoing representations were false and, in furtherance of the fraudulent scheme, were intended to induce Ehrman's trust and confidence.

72.     In fact, Martin's principal motivation was to exploit the relationship with Ehrman for purposes of advancing the Defendants' fraudulent scheme to induce Ehrman and the other targets listed herein to invest in Argentine businesses and to defraud

Ehrman and the other targets of their money and property in connection with those investments.

73.     In furtherance of the scheme, Martin transmitted the e-mail messages identified and set forth in **Exhibits E-1 and E-2** and, to this day, has continued to correspond with Ehrman in an ongoing effort to cultivate his friendship and sympathy and conceal her true role in the fraudulent scheme.

74.     In furtherance of their conspiracy and fraudulent scheme, the Defendants Martin, Leandro, Juan Pablo, Romulo, and de la Fuente, in face-to-face meetings with Ehrman during his May 2005 visit to Argentina, individually and collectively made a series of false representations to Ehrman for the purpose of securing his good will, trust and confidence.  Among the false representations made by the foregoing defendants were the following:

(a)     That Leandro was trained, licensed and accredited as a chartered accountant when, in fact, he was not licensed;

(b)     That Leandro had extensive business contacts worldwide and in Argentina; in fact he did not;

(c)     That Leandro had been schooled in business management and held a graduate degree in business from the University in La Plata equivalent to the American "Masters in Business Administration"; in fact he did not;

(d)     That Leandro was extremely experienced, competent and diligent in banking matters, personnel management, financial management and financial reporting, including preparing reports for USA GAAP accounting standards; in fact Leandro was not competent nor diligent in these matters, nor had Leandro experience or training in GAAP accounting or reporting;

(e)     That Leandro had excellent business acumen, had started several
successful new businesses, and had a widespread reputation for fair
dealing, competency and honesty; in fact Leandro had never been
successful in any independent business venture and had no such positive
reputation;

(f)     That Leandro had extensive business experience managing companies,
starting and operating business, budgeting, reporting, dealing with banks
and taxing authorities, and all stages of business planning; in fact Leandro
had no such experience or history;

(g)     That Leandro had been in charge of the family business Polibol for the
previous several years, and had assumed substantial control and direction
of the business starting only several years after he began to work at
Polibol at the age of sixteen; in fact his father Romulo continued to
manage the business and make most important business decisions, relying
upon Leandro for incidental input only;

(h)     That Leandro had been personally responsible for Polibol's profitability
when, in fact Polibol had been profitable before Leandro began working
there and showed no significant financial improvement based on
Leandro's alleged management; and

(i)     That Leandro was motivated to establish a long term relationship with
Ehrman founded on trust and good faith; when, in fact, he was only
motivated by short term personal gain and in furthering the fraudulent
scheme alleged herein.

75.     During Ehrman's May 2005 visit to Argentina, Defendants also brought
Ehrman to Polibol in La Plata on numerous occasions as part of their continuing effort to
secure Ehrman's trust and confidence.  During such visits to Polibol, the Maifredinis and
other agents of Polibol, including its upper managers, falsely represented to Ehrman in

the course of numerous conversations that Leandro had been solely responsible for

implementing and modernizing the firm's management information systems, making key

managerial decisions, business planning, banking and investment decision making,

deciding on, designing, choosing and implementing accounting and inventory tracking

systems, controlling inventory, and making operations decisions at Polibol.  These same

parties repeatedly and falsely stated that Leandro alone was in charge of final decisions at

Polibol.

76.     In fact, Romulo was responsible for the foregoing measures, all of which

had been completed before Leandro reached the age of majority and before Leandro had

achieved the seniority and responsibility at Polibol that he exercised in furtherance of the

fraudulent scheme.

77.     During the course of Ehrman's discussions with the Defendants in May

2005,  Martin, the Maifredinis and others repeatedly urged Ehrman to invest in Argentina

and falsely assured and promised him that, if he did so, they intended to and would

provide faithful stewardship of his assets, sound selection of investment opportunities,

and fully honest, trustworthy, effective and competent management, oversight and

preservation of Ehrman's interests and assets, and that they would do so out of friendship

and not for any personal economic gain or return.

78.     In the weeks and months following Ehrman's return from Argentina to

Boston in May 2005, the Maifredini defendants, in particular Leandro and Juan Pablo,

and Martin initiated numerous communications to Ehrman in the United States using the

International postal service, electronic mail messages, and telephone calls in continuing

efforts to obtain Ehrman's agreement to make financial investments in Argentina while,

at the same time, professing personal affection and friendship for Ehrman and his family in order to further gain his trust and confidence.  Many, but not all, of the foregoing e-mail communications are set forth in the Exhibits to this Complaint in numbers too great to make practicable more specific delineation herein.  See **Exhibits B-1, B-2; C-1,C-2, D-1, D-2; E-1, E-2.**

79.     On June 19, 20 and 21, 2005, defendant Leandro visited and stayed with the Ehrman family at their home in Newton, Massachusetts in order to further solicit and induce Ehrman's interest and commitment to making financial investments in Argentina.

80.     Ehrman relied, to his detriment, on Defendants' false expressions of good faith, selflessness, friendship, and magnanimity by placing his trust and confidence in Leandro and the other Defendants and in agreeing to invest in certain business ventures described herein, entrusting his funds to their care and stewardship, and in following their recommendations and advice, all as more fully described herein.

## ESTABLISHMENT OF FRAUDULENT ENTERPRISES

### Fraudulent Inducements - Promised Investment Structure:

81.     In furtherance of the fraudulent scheme, the Maifredini Defendants, in particular, Leandro and Juan Pablo engaged Ehrman in numerous communications via international telephone calls, electronic mail exchanges, and face-to-face meetings in Newton and Boston, Massachusetts by means of which they induced Ehrman in agreeing to form an Argentine holding company, under the name MAIEHR.  Leandro and Juan Pablo advised Ehrman that MAIEHR would serve as a vehicle through which to make and hold investments on Ehrman's behalf in Argentine business and real estate opportunities.

82.     Leandro and Juan Pablo also fraudulently induced Ehrman to assent to the formation of Esadet SRL ("Esadet"), another Argentine company.  Leandro and Juan Pablo informed Ehrman that they established for the purposes of holding, on Ehrman's behalf, his investments in certain Argentine real property, including Casa Villa Elisa and Casa Araucrias, as set forth in more detail below.

83.     In the course of numerous communications between Ehrman and the Defendants by way of electronic mail, telecommunications, and face-to-face meetings, on and between the dates of May 2005 through December 2007, the Maifredinis, individually and as agents of Polibol, along with other Polibol executives (including but not limited to Lucas Puertas, Nicolas Sredcoff, and Esteban Picardo) falsely represented and promised that each of them intended and would ensure that any holding company or companies they would or did establish to harbor Ehrman's investments, including Esadet and MAIEHR, and/or those of any affiliated interest would and, after the fact, did correspond to the structure and provisions outlined as follows (the "Agreement"):

(a)     All equity in each holding company would be held by Ehrman personally or a closely held entity owned or controlled by Ehrman and would be evidenced by documentation prepared in accordance with American Generally Accepted Accounting Procedures and Argentine legal requirements;

(b)     Any and all funds which Ehrman entrusted to the Defendants and transferred to Argentina for investment purposes were to be treated as loans from Ehrman to the Argentine entity evidenced by interest bearing promissory notes at the higher of prevailing Argentine government bond interest rates or current Argentine commercial bank loan rates.  The holding company shares were to be pledged as security for such notes;

(c)     Upon any investment attaining profitability, the holding entity's first obligation was to make repayment to Ehrman in the amount of his original loans plus accrued interest, expenses and costs;

(d)     The Defendants promised that they, with Polibol's assistance and cooperation, would manage the financial affairs of such investments and ensure compliance with all applicable United States and Argentine National, State and Local tax and other laws, regulations and accounting standards;

(e)     Neither Leandro nor any other Defendant was to acquire or hold equity in any Ehrman-funded holding company unless and until the holding company had become profitable, repaid all amounts due Ehrman and thereafter generated profits or had increased in value to the extent demonstrably attributable to Leandro's work or contribution, or to the extent Leandro made an actual cash capital contribution to the venture;

(f)     Contingent upon Ehrman's investments generating positive cash flow, Leandro was to be entitled to receive a draw of up to $10,000 USD per month, accrued as advance withdrawals from a future capital account, were he to receive an equity position in the future.  Leandro's draws were contingent upon current investments generating profits, as measured by generally accepted accounting principles, sufficient to pay such draws after liquidation, sale of property, or other such event;

(g)     Ehrman's business expenses were to be paid by the entity as related business costs; and

(h)     The structure of all financial transactions would be designed by Leandro to optimize results for Ehrman after United States and Argentine taxes.

84.     Examples of such email communications are contained in **Exhibits B-1 and B-2**, as follows:  Email ID 1129, dated 11/7/2005 from Leandro to Ehrman in which

the defendant attached a business plan and budget for the "Holding Company" entitled "Plan Inicial De Estructuracion Empresaria;" (the "Initial Plan") a true copy of which is annexed at **Exhibit J**;  Email ID 1216, dated 12/1/2005 from Leandro to Ehrman in which he advises that he had he attended several meetings in order to advance the formats for the correct legal structure for the holding company; Email ID No. 1222, dated 12/2/05 from Leandro to Ehrman, in which he makes similar statements to the prior message; and Email ID No. 1372, dated 12/16/2005, from Leandro to Ehrman which contains a lengthy description of the proposed structure of the holding company.   See **Exhibits B-1, B-2**.

85.     Translated, among the representations included in the Initial Plan was a promise that the Maifredini's would conduct independent analysis and evaluation of prospective business investment opportunities and would create professional structures for the administration and control of these investments.

86.     In fact, the Maifredini Defendants, generally, and Leandro Maifredini in particular, lacked the intention, skill or experience to undertake and fulfill either promise of independent professional evaluations or the intention of creating "professional structures" to manage such investments and instead intended to control and exploit any such investments for their own use and benefit.

**Detrimental Reliance by Ehrman in the Formation of MAIEHR and Esadet:**

87.     In reliance upon the foregoing promises and representations regarding his purpose and intent by Leandro, Ehrman acquiesced and agreed to the formation of the MAIEHR and Esadet holding companies for his investments.

88.     Consequently, with Ehrman's assent in principle, in or about the period of December 2005 to January 2006, Leandro and Juan Pablo and Polibol incorporated

MAIEHR as an S.A. or SRL for the ostensible purposes of serving as the holding company and for the actual purpose of furthering the fraudulent scheme.

89.     On information and belief, the Defendants formed MAIEHR for the purpose of furthering and executing their scheme to defraud the Plaintiffs of money and property by permitting the defendants to usurp and exercise dominion and control over Ehrman's funds and investment entities and thereby defraud him of the capital, proceeds and benefits of such investments.  To Ehrman's knowledge, the Defendants intended to and ultimately did employ MAIEHR principally as a vehicle to collect fees and payments from Ehrman in connection with the fraudulent investment vehicles Leandro, Juan Pablo and de la Fuente in collusion with the other defendants established, usurped, controlled and converted for their own use and benefit as set forth herein.

**Breach of Promises and Representations and Fraudulent Concealment:**

90.     In contravention of their representations, promises and agreements, in forming MAIEHR, the Maifredinis and Polibol made no provision for Ehrman to have any equity actual record interest in or control over MAIEHR.

91.     After forming MAIEHR, the Maifredinis falsely informed Ehrman that Ehrman owned 100 percent of MAIEHR and that Leandro was abiding by their agreement that Leandro's right to a draw and an equity position would accrue only after the holding company investments proved profitable.

92.     In order to conceal the true disposition of Ehrman's investments, Leandro, with the assistance and collusion of Polibol, established and maintained an Internet based limited access website (Extranet) at www.micharter.com/maiehr.  Leandro informed Ehrman that he had instructed Polibol through its employees to create a website

containing complete and accurate accounting of Ehrman's Argentine investments to the extent of the Defendants' management and control thereof.  In an electronic mail message dated August 8, 2006, E-mail ID No. 4827 set forth in **Exhibits B-1 and B-2,** Leandro informed Ehrman that the website was located at "http://www.micharter.com.ar/MAIEHR" and that it accurately reflected all of the expenses and investments paid and made on Ehrman and the plaintiffs' behalf.

93.     In fact, the sum and substance of the information the Defendant placed on the web site was intentionally incomplete, false and misleading in furtherance of their conspiracy to defraud Ehrman of his funds and the fruits of his investments as set forth herein.  The Defendants maintained the website from approximately August 2006 through the beginning of 2008, at which time it ceased to be accessible.

94.     Polibol updated and added information to the website at least once a month between August 2006 and 2008.  Leandro, Romulo, Juan Pablo and Polibol billed and received money from Ehrman for salary and other expenses of their employees including Lucas Puertas who they alleged created the website for Ehrman's benefit and updated the false and misleading information contained on it.  In e-mails sent on or about November 14, 2006, ID Numbers 6669, 6676, 6677 and 6670, Leandro purportedly broke down the costs and expenses incurred on behalf of Ehrman and the plaintiffs and demanded payment.  Again he informed Ehrman that the detailed explanation of the expenditures were available for Ehrman to review on the web site http://www.micharter.com.ar/maiehr. In E-mails ID No. 5024, dated August 17, 2006, Leandro instructed Ehrman how to access the web site using his, Leandro's, logon identification and password.  The referenced e-mail is set forth in **Exhibits B-1 and B-2.**

95.     Ehrman made repeated requests by for formal documentation of his ownership in MAIEHR and the Maifredini Defendants responded with repeated assurances that they would provide them.  Ultimately, the Defendants never delivered to Ehrman any documentation or any evidence that they had legally formed and/or incorporated MAIEHR, or any documentation of his ownership thereof, other than in the form of that contained on the micharter.com extranet.

96.     In fact, the Defendants the Maifredinis and Polibol effectively usurped ownership and control over MAIEHR and, to this day, have continued to exercise dominion and control over MAIEHR for the purposes of carrying out their conspiracy to defraud the Plaintiffs of their money and property.

97.     Notwithstanding that the Defendants never relinquished ownership or control over MAIEHR, they falsely billed Ehrman for costs and expenses associated with its operation, which Ehrman paid in reliance upon their continuing misrepresentations, including their misrepresentations that he owned MAIEHR and that they were acting in good faith and in accordance with their Agreement.  In November 2007, at his country club, Romulo personally threatened physical harm to Ehrman if Ehrman failed to completely pay for all items falsely billed by MAIEHR.

98.     Among the payments Ehrman made in connection with MAIEHR, are wire transfers identified on **Exhibit I**, and numbered and dated as follows: Trans No. 1, dated 10/25/05 transferred to Romulo Maifredini; Trans No. 2,dated 11/25/05; Trans No. 4, dated 12/9/05; Trans No. 5, dated 12/19/05; Trans No. 10, dated 11/21/06; Trans No. 18, 19, 20, and 21, dated 6/22/07; Trans No. 22, dated 7/14/07; Trans No. 23, dated 8/13/07.

### MISAPPROPRIATION AND CONVERSION OF CASA VILLA ELISA

**Initial Misrepresentations:**

99.     During the course of his June 2005 visit to the United States, Leandro brought with him business plans, photographs of potential properties to purchase, and schematics and business projections relating to real estate developments that would generate positive returns in excess of 50 to 100 percent after return of capital, interest and all expenses, all within an 18-20 month period, as had been discussed by the Defendants and Ehrman during Ehrman's visit to Buenos Aires in May 2005.  Both before and following his trip to Boston, Leandro sent via United States mail and electronic mail several packages of materials and information soliciting Ehrman's participation in Argentine real estate, construction and development projects, land, housing, apartments, agricultural land and other investment opportunities, including the purchase of other companies.

100.     During the course of his June 2005 visit to Massachusetts, Leandro proposed to Ehrman, in particular, that he invest in real property located at Calle 13 y calle 421, Villa Elisa, Buenos Aires, Argentina ("Casa Villa Elisa").  Leandro falsely represented that he had had discussions with local authorities, in which these authorities had approved in principal that Casa Villa Elisa could be developed by adding at least 16 new houses on the existing acreage of 0.8 hectares (approximately 2 acres) and that he and the other Defendants would assist Ehrman in so developing this property.

101.     In furtherance of their conspiracy, in or about August 2005, Defendants Leandro and de la Fuente, and Carlos Cantisano, a real estate broker in league with the Defendants, sent to Ehrman in Newton, Massachusetts via United States mail a package

containing plot plans and photographs of the Casa Villa Elisa property, a mark-up falsely purporting to show the outline of how the property had been approved by local authorities for development based on the construction of sixteen to twenty-four additional residences, and fraudulent financial analysis and profit projection.  In fact, no such development approval had been obtained from the local authorities.  The defendants made the foregoing representations knowing that they were false and did so with the intention that Ehrman rely upon it to his detriment in deciding to purchase the property, which he ultimately did.

102.    Thereafter, in a series of repeated and insistent telephone calls, electronic mail messages and text messages, sent through Internet and phone systems, the Maifredinis, and Martin, urged Ehrman to purchase Casa Villa Elisa, falsely repeating misrepresentations that they considered it a tremendous financial bargain which they had access to through their legitimate business contacts in La Plata and surrounding area.  In fact the only distinguishing feature of this property was the willingness of the real-estate agent and owner to participate in a kickback and fraudulent transfer scheme.  In addition, the Defendants falsely claimed that the existing residence could easily be rented for at least $2,000 USD a month without making any improvements.

103.    Throughout the foregoing communications Defendants falsely represented that they were experienced in and capable of developing the property with and for Ehrman, that the price they negotiated was so far below market value that it could easily be resold instantly at a substantial profit, if desired.  The Defendants falsely represented that failure to purchase this property promptly would result in loss of an important business opportunity, since other buyers were about to make offers and this was

prevented only by the current "in negotiation" status the Defendants held with the real estate agent. Additionally, they further falsely claimed that the city was about to re-open a nearby access ramp onto the highway leading to Buenos Aires and La Plata, which would markedly enhance the value of the property, that they had an inside track that allowed them to negotiate a substantial price reduction below the original sale price, and that they had contacted contractors on whose price estimates they had based their financial projections. The foregoing representations were knowingly and intentionally false.

104.    In the course of the foregoing communications, the Defendants undertook to purchase the property as Ehrman's agent, falsely representing that they would not charge him any fees for doing so.

105.    On or about December 21, 2005, Leandro, Juan Pablo, and de la Fuente brought Ehrman to personally visit Casa Villa Elisa during the course of which they repeated the foregoing misrepresentations. Additionally, the Maifredinis discussed purchasing Casa Villa Elisa several times at Polibol's offices and in Romulo's Argentinean residences in Abril CC, La Plata, Hudson, and Berazategui, as well as by telephone, electronic messages and voice over internet protocol ("VOIP") initiated from Polibol when Ehrman was in Boston.

106.    Among the e-mail messages sent by the Maifredini Defendants to Ehrman in order to induce him into trusting them and into agreeing to invest in real estate and ultimately to purchase Casa Villa Elisa were:  Email ID  665, dated 6/18/2005 from De La Fuente, **Exhibits D-1, D-2**; E-mail ID 709, dated 8/6/2005, from Leandro, see

**Exhibits B-1, B-2;** E-mail ID 1309, dated 12/14/2005 from Leandro, see **Exhibits B-1, B-2**.

### Misrepresentations Regarding the Formation of Esadet:

107.   In or about December 2005, the Maifredinis initiated and conducted a series of communications with Ehrman via international telephone, facsimile, electronic mail, Blackberry electronic mail and through in-person face–to-face communications during one or more visits made by Leandro to Ehrman's home in the United States, in which they fraudulently induced Ehrman to empower them to establish an Argentine corporate SRL entity, Esadet, for the purpose of taking and holding title to Casa Villa Elisa.  See also E-mail ID 1372, dated 12/16/.2005, from Leandro to Ehrman, regarding the structure of a "holding company." **Exhibits B-1, B-2.**

108.   In the course of the foregoing communications, the Maifredinis falsely informed Ehrman that urgent tax reasons and Argentinean currency entry regulations necessitated that Ehrman use an Argentine SRL to purchase and hold title to Casa Villa Elisa, that they intended that Ehrman would be the sole owner of the entity, that they intended to temporarily hold the Esadet shares in their own names, and that they intended to transfer ownership of all of these shares to Ehrman as soon possible but in no event later than when Ehrman physically returned to Argentina.  The foregoing representations and promises were entirely false and fraudulent and made in furtherance of their fraudulent scheme.

109.   Thereafter, defendants the Maifredinis and Polibol consistently and repeatedly assured Ehrman in the course of the foregoing communications that Esadet

had been created solely to act as Ehrman's ownership vehicle for Casa Villa Elisa, and

that it was owned and controlled exclusively by Ehrman.

110.    In or about February, 2006, the Maifredinis, with the assistance of other

Polibol employees, incorporated Esadet for the purported purpose of holding Ehrman's

interest in Casa Villa Elisa.  The Maifredinis, in addition to other Polibol employees,

falsely informed Ehrman that Ehrman was the beneficial owner of all shares of Esadet,

that the Maifredinis and Polibol were only temporarily holding the shares in Esadet only

due to and during Ehrman's absence from Argentina (as a favor to Ehrman), but that the

Maifredinis and Polibol would immediately transfer all shares in Polibol to Ehrman upon

Ehrman's return to Argentina.

111.    The Defendants falsely communicated the alleged details of the funding

and loan structure for Casa Villa Elisa to Ehrman in numerous electronic mail messages

sent from Argentina to Ehrman over the Internet, many, but not all of which, are set forth

in the Exhibits A-M, as well as in numerous communications held over the telephone,

VOIP (located at Polibol) and cell phones, and in personal conversations with Ehrman

and other(s) in Boston, Montreal and elsewhere.

112.    In addition, in furtherance of the fraudulent scheme, Leandro and Juan

Pablo falsely advised Ehrman that in order to enable them to purchase and manage Casa

Villa Elisa on Ehrman's behalf, the Defendants required that he execute powers of

attorney appointing them as his agent for this purpose.  Ehrman did so in reliance upon

the misrepresentations described herein.

113.    In fact, the Defendants Leandro, Romulo and Juan Pablo Maifredini and

their confederates proposed and organized the foregoing complex structure not to comply

with the requirements of Argentine law and to protect Ehrman's interests, but rather to enable them to take control of Esadet and to permit them to misappropriate and convert Ehrman's money and properties, and reinvest the proceeds thereof in further illicit transactions for their own personal benefit, at Ehrman's expense.

**Detrimental Reliance - Casa Villa Elisa Funding:**

114.   Ehrman relied upon the foregoing representations by the defendants in authorizing the formation of Esadet and in funding the purchase of Casa Villa Elisa and consenting to Esadet taking and holding title to the property, in reliance upon the Defendants' repeated promises and representations that they were acting in a fiduciary capacity on Ehrman's behalf in order to faithfully protect his interests, and that they intended that he would promptly receive and hold the entire beneficial interest in the new company.

115.   Ehrman relied upon the Defendants' false representations and directions as herein described and as set forth in certain e-mail messages which Defendant Leandro Maifredini sent to him or his attorneys, including, but not limited to: E-mail ID No. 1309, dated December 14, 2005 (informing Ehrman that Leandro had made a deal on Casa Villa Elisa for $230,000 and needed $66,000 for a down payment);  E-mail ID 1233 sent by Leandro on December 7, 2005, in which he transmitted wire transfer instructions to Ehrman, E-mail ID No. 1923, dated 2006-02-03; E-mail ID No. 2103, dated 2006-02-09, E-mail ID 2240, dated 2006-0102-15,  E-mail ID No. 2246, dated 2006-02-16 and E-mail ID 2252, dated 2006-02-17 all set forth in **Exhibits B-1 and B-2.**  Based on such representations and in response to instructions received from Leandro, Ehrman initiated wire transfers which totaled no less than $292,310 from Boston, Massachusetts and New

York, New York on December 19, 2005 payable to Romulo Maifredini in the amount of $100,000, and on March 9, 2006 in the amount of $682,731 and others to accounts in Argentina and Miami, Florida under the Defendants' control in payment of the purchase price of $550,000 for Viña Maipu and $132,731 for the purchase of grapes for the winery. Such specific wire transfers are reflected in and identified in **Exhibit I** as Numbers 5 and 7 dated December 19, 2005 and February 27, 2006, respectively.

116.     The Defendants applied only a portion of the funds Ehrman transferred to fund the purchase of Casa Villa Elisa, and misappropriated the balance, in part by charging Ehrman for fictitious expenses and in part by deliberately failing to credit Ehrman with the full amounts transferred.

**Fraudulent Misappropriation and Conversion of Esadet:**

117.     Using power(s) of attorney, fraudulently obtained from Ehrman, Leandro, Juan Pablo, Romulo, and de la Fuente executed the closing on Casa Villa Elisa on or about March 1, 2006. Immediately following the closing, the Maifredinis falsely informed Ehrman that they had consummated the purchase of Casa Villa Elisa on his behalf and promised to give Ehrman the closing documents and title certificates shortly thereafter.

118.     In addition, the Maifredinis took Ehrman to various notaries public to sign documents which they alleged to be necessary for the purpose of developing this project.

119.     In reliance upon the false representations of the Maifredinis that they had consummated the purchase of Casa Villa Elisa on Ehrman's behalf, Ehrman executed a series of documents before the various notaries public, based on the Defendants' representations that the documents were necessary to establish Ehrman's title to the

property and his ownership of Esadet and were otherwise related and necessary to the development of the property.  Although the Defendants made numerous promises to Ehrman that they would provide him with copies of the foregoing instruments, they never did so.

120.   Beginning several weeks after the closing, and on numerous occasions thereafter, Ehrman requested copies of the ownership documents for Casa Villa Elisa.  In response, defendants Leandro, Juan Pablo and de la Fuente again repeated their false assurances to Ehrman that they had purchased the property in Ehrman's name and falsely advised him that it was a customary business practice in Argentina for Notaries to hold the documents pending registration for as much as a year following the purchase.

121.   In fact, but unknown to Ehrman at the time, under normal and routine Argentine business practices, real estate closing documents are provided in uncertified form by an escribana immediately after the closing and certified copies are delivered to the buyer within days.

122.   In response to continued requests which Ehrman made for the purchase documentation and various expenses which were fraudulently billed to Ehrman via MAIEHR and other methods, Leandro later falsely stated that the ownership documents were safely stored in the area within Polibol's offices in La Plata, Argentina which they referred to as "Ehrman's" offices, and were available to Ehrman at his convenience. Those statements and representations were false, as, in fact these documents and others alleged by Defendants to be located in said offices were not located within these offices at any time.

123.     In furtherance of their fraudulent scheme, the Defendants made the foregoing representations to Ehrman in the course of initiating numerous international telephone calls, VOIP telephone calls, face-to-face meeting with Ehrman in Massachusetts and Argentina, and electronic mail messages sent by the Maifredini Defendants as set forth in **Exhibits A 2, B-1, B-2, D-1, and D-2**.

**Fraudulent Development - Expenses:**

124.     In addition to the foregoing, and in furtherance of the fraudulent scheme, both before and after the purchase of Casa Villa Elisa, the Defendants Leandro, de la Fuente, and Romulo initiated communications with Ehrman by international and local telephone, VOIP telephone calls, in face-to-face meetings in Newton and Boston, Massachusetts, in various locations in Argentina (including La Plata, Villa Elisa, Abril CC, and Buenos Aires), and in automobile transit from Boston to Montreal via New Hampshire and Vermont, Leandro, de la Fuente, and Romulo promised Ehrman that they would proceed immediately to undertake the work necessary to develop the property.  A number of the e-mail messages in which Leandro and de la Fuente communicated such misrepresentations are contained in **Exhibits B-1, B-2, C-1 and C-2.**

125.     In the course of the foregoing communications, the Defendants falsely promised to undertake further discussions with the municipal authorities, preparation and refinement of development plans, obtain construction bids and cost estimates, and hold discussion with realtors about marketing and selling lots and offering leasehold interests in the Case Villa Elisa development project.

126.     In fact, although the Defendants falsely informed Ehrman that they had undertaken the foregoing tasks and were actively working to develop the property in

accordance with the plans they had supplied, in fact, they never performed such tasks, never applied for permits, never drew up or caused to have drawn up plans, or took any steps whatsoever to proceed with the development, leasing, sale, or other commercialization of Casa Villa Elisa.

127.   Ehrman made repeated inquires regarding the status and progress of the development efforts.  In response the Defendants repeatedly and falsely assured Ehrman that "they were working on it" and that the cause of Defendants' continuing inability and failure to provide reports and documents were the result of "standard business practices in Argentina" and "delays by the authorities."  In fact, the defendants were in possession of the documentation, but in furtherance of the Fraudulent Scheme, actively concealed that fact and the contents of the documents from Ehrman.

128.   Additionally under the false pretense that Casa Villa Elisa belonged to Ehrman, Leandro requested and Ehrman supply him with Ehrman's VISA and other credit card numbers with which to pay expenses related to the project development. Thereafter, the Defendants charged to Ehrman's VISA credit card expenses allegedly related to Casa Villa Elisa, including but not limited to taxes, water and sewer, telephone and other utilities.

129.   For the next two years following the purchase of Casa Villa Elisa in March 2006, the Defendants made continuing representations and assurances to Ehrman that he owned Casa Villa Elisa and that they were actively working on developing it on Ehrman's behalf and in accordance with plans which he had approved.  In consonance with those representations, the Maifredinis charged and Ehrman paid for the costs of all improvements, utilities, alarm systems, gardener's wages, purchase of a lawn mower,

telephone services, office expenses in Defendants' offices in La Plata at Polibol

corresponding allegedly to space, cleaning services, personnel wages and other similar

expenses, together with automobile, gasoline and miscellaneous expenses for care and

maintenance, and expenses for alleged meetings with third parties all concerning the

planning, permitting and development and ultimate sale or leasing thereof.

130.     In addition, the Defendants also billed their personal automobile expenses

(including charges for Defendants' toll road usage) directly to Ehrman's credit cards

without his agreement or approval for such expenses.

131.     In fact, at all times relevant and material hereto, the Defendants never

undertook any of the planning, design, development, permitting, improvement and

maintenance initiatives that they had promised and assured Ehrman they had done and

were doing.

132.     Indeed, Ehrman repeatedly requested that defendant de la Fuente, the

architect, produce plans for the development of the land at Casa Villa Elisa.  At first, de

la Fuente promised to produce these plans working together with Defendants Leandro

and Juan Pablo.  However, ultimately de la Fuente told Ehrman that should inquire of

Leandro about the plans, since it was Leandro who was in charge of the project.  Ehrman

complied, but Leandro failed to supply Ehrman with such documentation, despite

repeated further assurances that he would do so.  To date, the Maifredini defendants have

failed to supply Ehrman with copies of the development plans in accordance with their

repeated assurances.

133.     Notwithstanding the Defendants' continuous assurances and

representations that Ehrman was the owner of Casa Villa Elisa, their continuing practice

of charging him for all expenses associated with the property, and their repeated assurances that they would furnish him with the formal documentation that would confirm the fact of his ownership and the justification for charging the expenses, the Defendants never conveyed title to nor any evidence of any beneficial interest in Casa Villa Elisa nor in Esadet.

### Fraudulent Lease and Misappropriation of Lease Proceeds:

134.   Following the purchase of Casa Villa Elisa, Leandro falsely informed Ehrman that he had been unable to locate a tenant for the property.

135.   In fact, during the first 18 months following the purchase of Casa Villa Elisa the Maifredinis leased the house under terms and to a tenant whose identity they concealed from Ehrman.  They did so without reporting the lease to Ehrman and without accounting for, or crediting to Ehrman, any proceeds thereof.  In fact, it later developed that the house had sustained fire damage during the tenancy, a fact that the Defendants concealed from Ehrman.

### Misappropriation and Conversion of Ehrman's Financial Investment:

136.   To this date and despite their repeated assurances of their good faith efforts, the Maifredinis and Polibol have failed to provide Ehrman with an accounting of the payment made for Casa Villa Elisa, nor documentation of his direct or beneficial ownership in the property.  Although Leandro informed Ehrman that the information concerning Casa Villa Elisa reported on the web site www.micharter.com was complete and accurate, it failed to disclose the true status of the development and the extent to which the Defendants were fraudulently charging expenses to the project.

137.    Likewise, despite the numerous promises which the Maifredinis made to Ehrman that they would supply him with copies of all documents evidencing that Ehrman, through Esadet, was the record owner of Casa Villa Elisa, Defendants have never provided Ehrman with either the originals or copies of such documents.  Nor have they given him a list of the notaries used and documents executed for this purpose, again despite repeated assurances that they would do so.  Moreover, contrary to their many representations that they had done so, Defendants did not store the Casa Villa Elisa documentation in the Polibol offices where Ehrman was promised it would be available to him.  In sum, to this date, the Defendants have never provided Ehrman the promised documentation of his ownership in either the real property at Casa Villa Elisa or in Esadet.

138.    Contrary to Defendants' numerous promises and representations communicated to Ehrman, despite the fact that Casa de Villa Elisa was purchased with Ehrman's money provided for this purpose, contrary to Defendants' actions under power of attorney for Ehrman and consequent fiduciary duty, and contrary to Ehrman's repeated request for accounting and other documentation as well as the transfer of shares, the Maifredinis and Polibol failed to render, convey or transfer to Ehrman any interest in Esadet, nor any accounting thereof (other than as documented and mentioned below), thus fraudulently converting Ehrman's interest in Esadet and Casa Villa Elisa to their ownership.

139.    Plaintiffs allege that Ehrman was never the record owner or beneficial owner of the property, that no such ownership documentation exists, and that the Defendants misappropriated and converted Casa Villa Elisa to their own use and purpose

and defrauded Ehrman of all the funds he transferred for the purpose of funding the purchase, maintenance, and development of Casa Villa Elisa.

140.    In reliance upon the false statements and representations made by the Defendants to Ehrman in relation to the Casa Villa Elisa purchase and alleged development effort, Ehrman transferred in excess of $400,000 USD to the Defendants in connection with that investment.

## MISAPPROPRIATION AND CONVERSION OF CASA ABRIL CC 24 ARAUCARIAS

### The Maifredinis Frustrated Ehrman's Efforts to Purchase a Residence:

141.    In a series of electronic mail messages they sent to Ehrman over several months in 2006, the Maifredinis repeatedly urged and sought to induce Ehrman to invest in real estate in Buenos Aires, Argentina and areas to the south of Buenos Aires including Abril CC and La Plata together with its suburbs, such as Villa Elisa, on the false and fraudulent basis that they would "help" Ehrman find good values in these areas for investment and further stating that without their help Ehrman would be victimized by unscrupulous real estate agents and sellers.

142.    As part of the effort to induce Ehrman to trust them and through them make real estate investments, the Maifredinis continued to falsely represent that their sole motivation for helping Ehrman was based on friendship and loyalty to Ehrman and his family, and not out of any desire for personal financial gain.  The Maifredinis expressly denied any potential intention to profit from Ehrman's purchase.

143.    Contrary to their representations, the Maifredinis exploited their trusted relationship with Ehrman in order to obtain kickbacks from sellers and real estate agents to whom they introduced him.  In furtherance of their conspiracy, the defendants

Leandro, Juan Pablo, and de la Fuente falsely advised Ehrman to avoid other real estate brokers and contacts and told him fictitious anecdotes about such other agents Ehrman met in order to dissuade Ehrman from acting independently. Leandro, Juan Pablo and de la Fuente insisted on accompanying Ehrman to every visit to a potential new apartment purchase.  Despite viewing hundreds of apartments and submitting numerous purchase offers, each through the Defendants, Ehrman was unable to consummate a purchase of an apartment in Buenos Aires.

144.    In their consistent attempts to seek kickbacks from potential sellers, the Maifredinis hindered, frustrated and effectively stymied Ehrman's efforts to consummate a purchase on financially reasonable terms because the sellers were unwilling to engage in the kickback scheme.  In each such instance that Ehrman's purchase offer was rejected for those reasons, the Maifredinis lied to him about the reason the seller rejected the offer and concealed from him their continuing efforts to exploit the arrangement to obtain kickbacks.

**Diversion to Araucarias:**

145.    Having succeeded in frustrating and defeating Ehrman's efforts to purchase a residence by secretly soliciting kickbacks from potential sellers, Leandro, in furtherance of the Maifredinis' conspiracy to defraud Ehrman, induced him to purchase a residential property in Abril CC, Argentina, located at Araucarias 24 ("Casa Araucarias").

146.    Casa Araucarias was selected by the Maifredinis, and the offer, purchase agreement, signature of sales contract, inspection of the property, closing and purchase were all effected through defendants Leandro, Juan Pablo, and de la Fuente, acting in various capacities and, in the case of Leandro, with a power of attorney given him by

Ehrman in reliance upon, inter alia, Leandro's repeated misrepresentations of good faith. Leandro failed to register the purchase of Casa Araucarias with Argentine tax authorities as required by Argentine law, and failed to recommend purchasing Casa Araucarias with an SRL business entity (with Ehrman as the beneficial owner) as would optimally benefit Ehrman per Argentine tax law, as required by Leandro's Agreement with Ehrman.

147.    Defendant de la Fuente served as the inspecting architect and counseled Ehrman to buy the house, which he falsely represented to Ehrman to be "a good deal" and in satisfactory condition, stating that minor cosmetic work could improve the house but was not truly necessary.

148.    In fact, de la Fuente knew that the house was riddled with defects so severe as to preclude occupancy and use without exposing Ehrman and his family to the danger of potential structural failure.  De la Fuente deliberately concealed from Ehrman the full extent and nature of structural defects and necessary repairs and instead falsely represented to Ehrman that he had calculated that the proposed cosmetic work would cost between $50,000 USD and $100,000 USD.

149.    Among the e-mail messages which the defendants transmitted to Ehrman concerning Casa Araucarias were the following:  from Leandro E-Mail ID 7414, dated 1/29/07, Email ID 7428, dated 1/30/2007;  Email-ID 7777, dated 2/13/07;  Id 7973, dated 2/17/07; Id 8072, dated 2/190/07, see **Exhibits B-1, B-2;**  and from de la Fuente, Email ID 8996, see **Exhibits D-1, D-2.**

**Fraudulent Reconstruction and Oversight:**

150.    Following Ehrman's purchase of Casa Araucarias and the expiration of the rescission period under Argentine law, de la Fuente communicated with Ehrman via

telephone, VOIP telephone, Skype, electronic messages, and letters through the international and United States postal services in which he disclosed for the first time the extensive structural defects, of which he had prior knowledge, and detailing the efforts he proposed to undertake to resolve same.

151.    In furtherance of the Maifredinis' conspiracy to defraud Ehrman, de la Fuente undertook to oversee and manage the repairs in order to inflate costs, divert materials, and charge kickbacks in order to enrich himself and the other Defendants at Ehrman's expense.

152.    Under de la Fuente's direction and control from April 2007 through February 2008, he undertook extensive repairs which proved necessary to prevent the structure from collapsing of its own weight.  De la Fuente undertook to have repairs made to the foundation, the concrete columns, and steel beams.  Despite the fact that he had performed the initial inspection, De la Fuente reported to Ehrman that the roof required replacement because it had been so improperly constructed that he deemed it irreparable because it was allowing large volumes of water into the structure causing rot and decomposition of the wood, brick and mortar walls.

153.    In reliance upon de la Fuente's misrepresentations regarding the condition of the building and the necessity of extensive repairs, Ehrman incurred costs in excess of $270,000 USD.

154.    As of February 2008, after all of the foregoing and other extensive work, all of which had been allegedly supervised and directed by de la Fuente, the house was left without a roof, without any interior plumbing or electricity, without heating or cooling, without windows, and with extensive excavations for additional foundation

work.  As of that point, de la Fuente falsely reported to Ehrman that the total cost of the remaining work could be completed in three months for less than $300,000 USD and that he needed an initial payment equivalent to $25,000 USD to pay for additional plans, permitting, and preparations for the work.

155.    In reliance upon de la Fuente's foregoing misrepresentations, and his further misrepresentation that he had submitted plans to the local authorities and obtained the necessary approvals (copies of which he falsely promised to forward to Ehrman), Ehrman gave de la Fuente the use of a bank debit card and authorized him to withdraw funds as necessary from a United States bank account which Ehrman set up to pay the costs of such plans and permits and further remediation.

156.    Defendant de la Fuente has since failed and refused to provide Ehrman with either copies of the plans or with any other evidence that he submitted the plans to local authorities for architectural review or approval, much less that he actually acquired the approvals previously claimed.

157.    During the course of construction de la Fuente purchased and billed Ehrman for approximately 300 square meters of antique pine wood for flooring, together with another 300 square meters of ceramic tiles at a cost in excess of $30,000.  De la Fuente charged some of these items to Ehrman's credit cards and others he billed to Ehrman as construction charges.  De la Fuente never delivered those materials to either the construction site or to Ehrman in any other fashion and is believed and therefore is alleged to have misappropriated and converted these and other materials to his own use and purpose.

158.     In the face of de la Fuente's continuing failure to furnish him copies of either the approved set or submitted plans, Ehrman demanded that de la Fuente furnish a signed, legal statement of anticipated costs and work duration.  In response, de la Fuente submitted a new estimate for additional work at a cost of approximately $1,500,000 USD to be spent over a period of at least one year, but has otherwise refused to furnish Ehrman with the relevant approved plans.

159.     Casa Araucarias proved to be an un-inhabitable ruin. Ehrman received notice from the neighborhood association that they intended to commence an action against him as a result of its status.  Consequently, Ehrman was compelled to sell the property at a substantial net loss.

160.     In furtherance of their fraudulent scheme, the Defendants continually expressed their false representations and assurances regarding Casa Araucarias in a series of numerous electronic mail messages contained in Exhibit Categories A-F, including, but not limited to the following:  From de la Fuente, the following:- Email ID 665, dated 6/18/2005; Email ID 5409, dated 9/7/2006; Email ID 8996, dated 3/29/2007. E-Mail ID No. 3920 dated July 19, 2006, ID 10323, dated 7/5/2007, ID 10738, dated 8/28/07, see **Exhibits D-1, D-2**;  and Emails from Leandro as follows: E-Mail ID No. 2375, dated March 16, 2006. See **Exhibits B-1, B-2.**

161.     As a consequence of the Maifredinis foregoing conduct and activities, Ehrman sustained a net loss in connection with Casa Araucarias of approximately $500,000 USD, an amount comprised of the property purchase price plus the alleged remediation expenditures, interest and expenses reduced by the net proceeds of the sale.

## MISAPPROPRIATION AND CONVERSION OF VIÑA MAIPÚ

### False Representations Inducing Ehrman to Purchase Winery Viña Maipú:

#### Defendants' False Representations Regarding Skills, Experience and Purpose:

162.    As part of their scheme to defraud the Plaintiffs, and at all times material hereto, acting on their own behalf and as agents of Polibol, the Maifredinis initiated numerous electronic mail, international phone communications, and VOIP telephone calls with Ehrman and other potential targets commencing in or about May 2005 and extending through 2007, for the purpose of soliciting their investments in the Argentine wine industry, under the defendants' management and supervision.  The Maifredini defendants alleged that they had the contacts, business knowledge, skills and experience with which to generate substantial profits in the wine industry by purchasing multiple wineries and consolidating management and production resources.  Some but not all of the e-mails transmitted by each of the defendants are identified and set forth in **Exhibit Categories A-1 through and including H-2.**

163.    In the course of his visit to Newton, Massachusetts where he stayed as a guest in Ehrman's home on June 20 and 21, 2005, defendant Leandro brought photographs of wineries and a preliminary "business plan" for investing in such wineries and held a number of discussions with Ehrman in which he falsely extolled his alleged winery management skills and abilities in furtherance of the fraudulent scheme to induce Ehrman to invest in the purchase of a winery.

164.    More particularly, in the course of the phone, electronic mail, and face-to-face communications with Ehrman, defendant Leandro falsely informed Ehrman that he had great experience selling wine, and that his family, especially defendants Juan Pablo

and Romulo, and his family corporation, Polibol, had many contacts, such as experienced winery managers and marketers.  Defendant Leandro falsely represented to Ehrman that he, together with Juan Pablo and Polibol, possessed the knowledge, skills and management experience which would enable them to reduce the operating costs of most Argentinean bodegas (i.e. wineries), increase their production efficiency and quality, improve the marketing of the wine, and greatly increase profits by introducing modern managerial practices, adding state of the art management technology, improving purchasing and inventory control procedures, and improving selling and customer support techniques.  Leandro falsely claimed to be expert in each of these areas and to have studied methods to apply these techniques to the Argentine wine industry.

165.    In fact the Maifredinis had little or no experience in any of these areas in which they claimed expertise.

166.    Leandro also falsely represented that he was willing to devote his own personal time and attention to the supervision and management of a winery, should Ehrman agree to invest in its purchase.

167.    In the course of the foregoing communications, Leandro and Juan Pablo falsely and repeatedly informed and assured Ehrman that they were committed to working in Ehrman's best interests as his friends.

168.    Leandro and Juan Pablo's true motive was to induce Ehrman into investing in the purchase of a winery in order for the Maifredini's to usurp dominion and control over the venture and to exploit Ehrman's investment and thereby defrauding him and such other targets as they could ensnare in the scheme for the Maifredinis' personal benefit and aggrandizement and that of Polibol.

**False Representations re Financial Condition and Viability of Viña Maipú:**

**False Statements re: Pre-Purchase Financial Analysis:**

169.    Beginning in August, 2005 and extending into March, 2006, in face-to-face meetings with Ehrman, and in phone, VOIP telephone calls, and electronic mail communications transmitted by the Maifredinis, including those set forth in the **Exhibit Categories  A-H** hereof, Leandro Maifredini and Juan Pablo Maifredini falsely represented to Ehrman that they and their staff (at Polibol) had analyzed a large number of wineries as potential acquisitions and subsequently had objectively identified from among this large number one particularly timely and valuable investment opportunity in the form of a winery located near Mendoza, Argentina named "Viña Maipú."

170.    Examples of such email messages include but are not limited to the following: as set forth in **Exhibits B-1 and B-2:**  Email ID No. 883, from Leandro, dated 8/25/2005 in which Leandro informed Ehrman that he had analyzed a number of wineries and was attaching information on what he considered to be the three most attractive; Email ID 1129, from Leandro to Ehrman, dated 11/7/2005, in which Leandro advised Ehrman that his financial analysis projects that Viña Maipu would break even on operating costs no later than December, 2006; Email ID No. 1306, dated 12/13/2005, from Leandro to Ehrman, transmitting further information about Viña Maipu and other potential winery investments; and Email ID No. 1365, dated 12/12/2005, transmitted by Leandro to Ehrman concerning the costs of due diligence and purchase price in connection with the winery.

171.    In fact, the Maifredinis, individually and as agents of Polibol, had analyzed these properties not with the intent to form and operate a legitimate business

operation, but rather with the intent of selecting a business that would afford them the opportunity to assume its dominion and control and exploit the entity for purposes of fraud and self dealing in order to enrich themselves and Polibol as part of their overall conspiracy and fraudulent scheme.

172.    While recommending the purchase of Viña Maipú to Ehrman, the Maifredinis and Polibol falsely represented that Viña Maipú had been and was then currently profitable to the extent of approximately $150,000 to $200,000 USD per year net of taxes and all other expenses, including payments to the seller.  The Maifredini's communicated such representations in the course of transmitting the e-mail messages set forth in the **Exhibit Categories B and C** hereof.

173.    In connection with such e-mails, the Maifredinis also sent e-mail attachments containing financial projections of revenues and expenses and financial reports of past winery performance.  Examples of such projections include but are not limited to the following:  Email ID 2621, dated 4/6/2006, Leandro sent Ehrman a purported analysis of Viña Maipu entitled "Informacion Mercado Vitivinicola Y Vina Maipu," a copy of which is attached as **Exhibit K-1.**  Leandro attached to that same email several financial analyses, including that attached as **Exhibit K-2**, and a further analysis in which he claimed that by working with the prior owner, his team had already achieved production cost reductions of 17 percent.  See **Exhibit K-3**.  Leandro also falsely represented, in **Exhibit K-1**, that Viña Maipú had a capacity of 3.05 million liters, when in fact its actual capacity was less than half that amount.

174.    The projections and other performance reports Leandro submitted to Ehrman and other potential targets were wholly false and fictitious as they were not based

on actual data concerning the winery financial performance and but instead ignored and concealed past data in their possession which contradicted their assertions.

175.   The Maifredinis falsely represented that under their management, and with the assistance and expertise of Polibol, they would undertake and institute measures to improve management and reporting by which Viña Maipú would easily and promptly increase its gross sales, reduce its expenses and increase its profits many fold, when, in fact they harbored no such intentions and possessed no such ability, skill or experience.

**Prior to the Purchase of Viña Maipú, Defendants Concealed and Withheld Disclosure of Viña Maipú's Financial Statements:**

176.   At the time that the Maifredinis and Polibol communicated the foregoing historical financial analysis and projections, they were in possession of financial information and reports from Viña Maipú that contradicted their assertions of past and future profitability and, in fact, they possessed information and were aware and fully knowledgeable that the winery had been historically and continued to be unprofitable.  In fact, the winery had been operating at a loss for a significant period of time and those losses were increasing up to the point of sale and were, at the time, typical of and endemic to the Argentine wine industry.

177.   In fact, at the time Defendants portrayed the winery as historically and currently profitable, they were also in possession of information that the current owner, Carlos Aranda, was motivated to sell the winery because he had experienced increasing operating losses and he was concerned over the negative effects of inflation and adverse fluctuations in the United States and Argentine currency exchange rates.  The Defendants

communicated none of the foregoing information to Ehrman and, instead, actively

concealed it from him.

178.   Leandro and Juan Pablo falsely represented their intention to obtain profit

and loss statements and other traditional accounting reports concerning the winery that

would demonstrate the winery's historical and current profitability.  In fact the

Maifredinis had already obtained such reports which demonstrated that the winery had

become increasingly unprofitable.  They then concealed those financial reports from

Ehrman. Instead of disclosing the information to Ehrman, they falsely advised him that

the winery's profit and loss statements and other accounting documentation were

unavailable because, they claimed, Viña Maipú had been operated in what they falsely

characterized as the traditional Argentinean informal reporting and accounting manner.

179.   At all times relevant and material hereto, the Defendants never provided to

Ehrman nor otherwise shared with him the information about Viña Maipú that they had

received from the seller and actively concealed that information from him throughout the

years 2005 through 2007.

180.   In addition, prior to the purchase of Viña Maipú, Defendants were also

aware of and actively concealed from Ehrman the fact that Viña Maipú was in a state of

material disrepair and in need of substantial renovation and remediation in order to

function safely, efficiently and in a manner comparable to the standard Defendants had

falsely represented existed at Viña Maipú

### Defendants' Fraudulent Negotiation and False Representations re Viña Maipú Purchase and Sale Price:

181.   Prior to the purchase of Viña Maipú, the Maifredinis falsely represented to

Ehrman that Viña Maipú was offered for sale at $1,000,000 USD by its owner, and that

the owner's motive for the sale was that the owner was getting too old to manage Viña Maipú and was unwilling to allow his son-in-law to manage it.

182.    Subsequently, the Maifredinis falsely represented to Ehrman that they had negotiated with the seller for a reduction in the sale price from $1,000,000 USD to $900,000 USD, then further to $750,000 USD and ultimately to $500,000 USD in Ehrman's best interest.

183.    In fact, the Defendants had undertaken no such negotiations, and as Defendants knew, $500,000 USD was the seller's original asking price and the seller was willing to accept less than that amount in exchange for the winery.  Leandro offered the former owner the actual asking price.  See **Exhibit B-2,** Email ID 1238, dated 12/8/05 (informing Ehrman that he made an offer to purchase Viña Maipu); E-mail ID 1244, dated December 9, 2005 (informing Ehrman that the seller accepted the Viña Maipu purchase offer); Email ID 1332, dated 12/15/05. Email ID 2326, dated 3/8/2006, from Leandro to Ehrman, setting forth the costs of acquiring and operating the winery; and Email ID 2382, dated 3/16/06,  from Leandro to Ehrman re winery operation and funding strategies.

184.    While falsely stating that they were engaged in negotiating a lower purchase price for Viña Maipú in Ehrman's interest, the Maifredinis engaged in negotiating exclusive sales rights for themselves from Viña Maipú for all foreign sales and kickbacks of the sale price to defendants Irusta, Leandro, Juan Pablo and Romulo.

**Detrimental Reliance by Ehrman on Defendants' False Representations:**

185.    Ehrman relied upon the Maifredinis' false representations about Viña Maipú, including false representations about its physical condition, their analysis of its

past financial performance, their analysis of its projected profitability, their statements

regarding its inflated capacity, their claims that they negotiated a reduction in the

purchase/sale price from $1,000,000 USD to $500,000 USD, and their false

representations regarding Leandro's and Irusta's winery managerial experience; and

based on the further representation that they would and ultimately did perform due

diligence.  See Exhibit B-2, Email ID 1372, dated 12/16/05.

186.    Based on the foregoing false representations, Ehrman undertook to

purchase the winery and entrust its management to the Defendants.  Ehrman acted in

reliance on the false statements made by the Maifredinis in going ahead with the purchase

of the winery and incurring all expenses in excess of revenues incurred as a result.

187.    In addition to the e-mail messages previously identified, Ehrman relied in

part on electronic mail messages transmitted by Leandro to Ehrman, as set forth in

**Exhibit B-2,** including Email ID 1233, dated 12/ 7/2005 in which Leandro transmitted

wire transfer payment instructions to Ehrman.

188.    Based on the Maifredinis' representations as reflected in the e-mail

messages and attachments identified in Exhibit Categories A, B, C, J and K, among

others, and those particularized above, Ehrman proceeded with the purchase of Viña

Maipu and, in so doing, at the Maifredinis' instructions, executed a wire transfer of

December 19, 2005 referenced above and, on March 9, 2006, a second wire transfer

payable to Carlos Aranda in the amount of $682,731 to purchase the winery and to

purchase grapes for wine production. See **Exhibit I,** Trans Nos. 5 and 8.

189.    Based on the Maifredinis' and Polibol's false statements regarding the

necessity thereof, Ehrman executed powers of attorney authorizing the Maifredinis and

Irusta to act for Ehrman and Viñas Argentinas LLC (a corporate entity formed by Ehrman in connection with his investment in Viña Maipú) as "apoderados," i.e. as attorneys in fact, which obligated each of them to exercise duties of good faith and fair dealing in managing Viña Maipú, implementing the management initiatives as they had promised, and in operating the winery in accordance with their promises and representations for Ehrman's sole benefit.

### The Defendants Committed Fraud in Connection with Execution of the Purchase of Viña Maipú:

190.    By electronic mail message dated March 15, 2006, Leandro purported to account for the application of the purchase proceeds and, therein, falsely advised Ehrman that the Defendants had paid the brokerage fees, to broker Hector Rivarola ("Rivarola"), as part of the purchase price for Viña Maipú in the amount of $30,000.

191.    In fact, although Rivarola had requested that he be paid a brokerage commission of $30,000 USD, Leandro, Juan Pablo and Irusta diverted half of this amount to themselves.  At the closing, in the presence of Leandro and Juan Pablo, Irusta demanded that Rivarola provide them with a fraudulent receipt representing that he had received the full commission of 30,000 USD when, in fact, Irusta demanded and received half of the commission for himself and "the boys" i.e. Leandro and Juan Pablo.

### After the Viña Maipú Purchase - Defendants Usurped Control of Viña Maipú and Fraudulently Converted Income and Expenses to Their Own Use:

### Defendants Usurped Dominion and Control of Viña Maipú:

192.    Following the winery's purchase in March 2006, and through November 2007, Defendants Leandro, Juan Pablo and Irusta usurped and exerted control over the management and affairs of Viña Maipú, by exercising the powers of attorney they had

fraudulently obtained from Ehrman in connection with the winery's purchase.  While at all times purporting to act in Ehrman's best interest, they instead used their positions as officers and directors of the winery and "apoderados" to engage in acts of self-dealing, theft, mismanagement, and fraudulent concealment in execution of their conspiracy to operate Viña Maipú for their own benefit and corrupt purposes in furtherance of their conspiracy and fraudulent scheme, all as more fully set forth herein.

193.    Following the purchase of Viña Maipú, defendant Juan Pablo held himself out as Vice President of Viña Maipú and sent electronic mail messages through the Internet using that title. For example, in **Exhibit C-2,** E-mail ID No. 2508, dated March 31, 2006, Juan Pablo identified himself as "vicepresidente" to the events coordinator at Hotel Colon, using the signature block "Lic. Juan Pablo Maifredini, Vicepresidente, Bodega Viña Maipu, 54 261- 492-1683, www.maipuwines.com; see also E-mail ID No. 6838, dated December 1 2006, in which Juan Pablo again held himself out as "vicepresidente" to Amador Villarello in Mexico.  See also **Exhibit B-2**, E-mail ID 3650 transmitted by Leandro to Helene Marsot on June 2, 2006 in which Leandro identified Juan Pablo as Viña Maipu vice president ("Juan Pablo Maifredini, Vice-Presidente de Viña Maipu");

194.    The Maifredinis falsely represented to Ehrman, in person and in telephone conversations and electronic mail communications, that they had interviewed and screened many applicants for the job of the winery manager, and that defendant Irusta was by far the most qualified of such candidates.  In fact, the Defendants had done no such screening of candidates and had made no efforts to locate and retain any one other than Irusta.

195.    The Maifredinis falsely represented to Ehrman that Irusta had extensive experience as a winery manager and other experience in the wine industry, as well as many contacts that would prove useful to the winery, and that he had agreed to manage the winery and was working diligently and assiduously to oversee employees, improve management and oversight systems and controls at the winery.  In fact, Defendant Irusta was a friend of the Maifredinis who had no experience as a winery manager, had never been a winery manager, and had few contacts in the wine industry.  On information and belief, the Maifredinis selected Irusta based upon his personal loyalty to them and his willingness to cooperate with and participate in the conspiracy to defraud Ehrman.

196.    To that end, the Maifredinis and Polibol engaged Irusta, ostensibly to manage the winery, but actually for the ulterior purpose of permitting them to exert dominion and control over the enterprise and use it to perpetrate their fraudulent and corrupt schemes.

197.    Once employed by Leandro as the general manager of the winery, Irusta devoted little of his time to winery affairs, despite drawing a salary of 4500 pesos per month, an amount equivalent to a full time salary, and which made him the highest paid winery employee.  Although the Maifredinis repeatedly insisted to Ehrman that Irusta was a highly experienced winery manager whose value and loyalty exceeded his compensation, Irusta's efforts at the winery were devoted virtually exclusively to furthering the Defendants' conspiracy to exploit and convert the winery and its financial affairs to their own uses by taking kickbacks, falsifying contracts, diverting funds, and misappropriating money and goods for themselves all as more fully set forth herein.

198.    Based on the representations of the Maifredini defendants set forth above,

Ehrman acquiesced in accepting Irusta's role as the Maifredini's day-to-day

representative concerning winery operations.

### In Exploitation of Their Dominion and Control of Viña Maipú, Defendants Engaged in Theft of Corporate Assets and Opportunities, Charged Fraudulent Expenses and Committed Acts of Deliberate Neglect and Mismanagement:

#### Fraudulent Business Reimbursements and Marketing Expenses:

199.    At all times relevant, the Defendants falsely assured Ehrman that they

were managing Viña Maipú marketing and sales costs in conformity with standard

industry practice; in fact, contrary to standard industry practice, Defendants billed Viña

Maipú for all such expenses and, in the exercise of their control, paid themselves for such

expenses while increasing Viña Maipú's bank indebtedness to cover such expenses.

200.    Starting in or about March 2006, and continuing through 2007, defendants

Juan Pablo, Leandro, Polibol and Irusta charged Viña Maipú unauthorized fees or sales

commissions for "facilitating" wine purchases and shipments to existing clients of Viña

Maipú.  Doing so was in direct contravention of their promises and representations made

to Ehrman at the time of the winery's purchase, at which time they renounced any

intention or entitlement to be paid commissions.  Not only were the fees entirely

unjustified, and were unauthorized by and concealed from Ehrman, the Defendants

charged rates substantially in excess of what was usual and customary.  In some instances

the Defendants charged duplicate commissions in addition to commissions which Viña

Maipú rightfully paid to third parties.  Defendants consummated these transactions by

fraudulently exercising the powers of attorney given them by Ehrman which enabled

them to issue and sign checks payable both to themselves and/or to entities which they owned or controlled.

201.   Falsely claiming that they were engaged in legitimate sales and marketing efforts, the Defendants engaged in lavish and excessive "marketing trips" around the world charging the Plaintiffs in excess of $173,000 USD, for five star hotel accommodations, expensive meals and entertainment expenses.  Through numerous electronic mail messages and repeated phone calls using the United States and international telecommunications facilities, defendant Leandro falsely advised Ehrman that he himself was paying at least 50 percent of his travel and other expenses, when in fact, he was double-billing these charges, first to Viña Maipú and then to Ehrman directly.  Instead of devoting these trips to Viña Maipú marketing purposes, the Defendants undertook many of them for sole purpose of advancing the exclusive interests of Polibol in the sale of plastic products.

202.   During the interval March 2006 through November 2007, while ostensibly marketing products at Viña Maipú's expense, Defendants concealed from the Plaintiffs the identity and contact information of third party business opportunities, and instead exploited that information to further Polibol's business interests.

203.   Defendants authorized and paid from Viña Maipú's accounts false and fraudulent "reimbursements" to Defendants Irusta, Juan Pablo and Leandro.  Such unauthorized expenses included Irusta's personal automobile, fuel, parking and similar expenses unrelated to legitimate winery purposes and outside the scope of the Defendants' relationship to Ehrman and the winery.  The Defendants concealed these expenses by deliberately maintaining no records, documentation or explanation for the

expenses.  They simply ordered Viña Maipú's bookkeeper to pay the expenses or simply

paid them themselves.  Leandro and Juan Pablo then ordered Viña Maipu employees not

to discuss these issues with Ehrman.

204.    While falsely purporting to be engaged in marketing activities on behalf of

Viña Maipú, the Defendants converted Viña Maipú's business opportunities to

themselves by selling wines and other products from third party entities, including

Polibol, while charging the marketing costs and expenses such as sample shipments, wine

fair subscriptions, fees and commissions for such transactions to Viña Maipú.  Not only

did such activities bear no relation to the affairs of Viña Maipú, in many instances the

Defendants engaged in transactions with competitors in direct conflict with the interests

of Viña Maipú.

205.    Defendants subsequently double-billed many of these same fraudulent

expenses to Ehrman directly through MAIEHR, the holding company Defendants

convinced Ehrman to form for the purpose of transferring funds.

### Defendants Misappropriated Wine Production Inventories and Gave Unauthorized Discounts Unrelated to Viña Maipú Business Purposes and In Furtherance of Their Own Interests:

206.    During the interval March 2006 through August 2007, the Maifredinis and

Irusta ordered and manufactured at least 900 cases of Viña Maipú wine at its expense and

misappropriated the same for their personal use and that of their friends, associates and

clients of Polibol, causing manufacturing costs of in excess of $27,000 USD and a loss of

revenue in excess of $40,000 USD.

207.    In addition, Defendants misappropriated and converted an estimated 1,000

cases of other Viña Maipú wines to their own personal use and that of Polibol, storing

substantial quantities of such Viña Maipú wine at Polibol and in their homes in Abril, Argentina, and in their apartments in La Plata, Argentina.  In the summer of 2007, Ehrman inadvertently observed several stockpiles of such wine in the apartment of Romulo in La Plata, in the family home of the Maifredinis in Abril, and in the commercial offices of Polibol. In order to conceal the truth of their misappropriations, the Maifredinis falsely advised and assured Ehrman that they or Polibol had paid Viña Maipú for the wine.  The Defendants, in particular, Irusta, also falsely advised Ehrman that the Defendants had given significant quantities of Viña Maipú wine to important Viña Maipú bankers and customers in order to engender good will when, in fact, virtually all of the wine they had misappropriated had been for their own personal use or that of Polibol.

208.    In addition to misappropriating wine, the Maifredinis and Irusta charged Viña Maipú for the costs of shipping the misappropriated wines to Polibol and to their homes in and around Buenos Aires and La Plata, Argentina.

209.    Despite the fact that the Defendants assured Ehrman that they were maintaining full and complete records of the wine inventories, the Defendants concealed the fact and extent of their wine misappropriations from Ehrman by deliberately failing to keep accurate records, documentation or receipts of such transactions and by specifically forbidding Viña Maipú's employees from keeping such records or mentioning such misappropriations to Ehrman and/or Ehrman's representatives.

210.    As a consequence of the foregoing, for the 900 cases of Sublimis wine and approximately 1,000 cases of other wine, Viña Maipú lost between $27 and $50 USD per case, which amounts represented the costs of production, excluding overhead, and suffered damages in excess of $75,000 USD.

211.     During the period March 2006 through August 2007, the Defendants gave unauthorized discounts and free containers of wine to third parties for purposes of promoting their own personal business interests and rewarding their own personal associates and those of Polibol.

212.     Among other methods, the Defendants perpetrated such fraudulent transactions by recording purchase orders at a fictitious price and then after shipment, voiding the receivable due.  As an example of the foregoing, the Defendants forgave a Hong Kong Polibol customer, Donald Jackson of Jackson Wines, the full amount of a Viña Maipú invoice in response to his complaint that the wine shipment had been delayed in customs because Irusta had mislabeled the shipment container in disregard of his instructions and because the Maifredinis did not want to jeopardize the relationship between Donald Jackson and Polibol.

213.     The e-mail thread attached as **Exhibit L** reflects the foregoing transaction and demonstrates that on "marketing" trips to Hong Kong which the Maifredinis billed to Vina Maipu, they were actually engaged in work for Polibol, which included  marketing "generic" wine from a competitor of Vina Maipu..

214.     Defendants ordered and purchased a custom-label in the name of Polibol and gave the Polibol-labeled wine as gifts to Polibol customers, all at Viña Maipú expense.  In addition, the Defendants extended discounts and credit terms to Polibol customers and to their friends and associates at prices below Viña Maipú's manufacturing costs and later fraudulently relied on such transactions as grounds for charging fraudulent sales commissions.

### Fraud in the Execution of Viña Maipú Remediation and Maintenance:

215.    Following his purchase of Viña Maipú, during a routine visit, several winery employees covertly suggested to Ehrman that he retain experts to evaluate the condition of the winery.  In response, in or about March 2006, Ehrman directed the Defendants to obtain evaluations from several consulting firms including Reboredo Asociados ("Reboredo"), an architectural and engineering firm with extensive experience in the winery design and construction business.  The Defendants purportedly agreed to do so, falsely stating that they were in agreement with and would cooperate in such measures.

216.    In March and April 2006, Reboredo performed a structural and maintenance evaluation, identified a number of defects in the winery's physical condition and, in May 2006, produced detailed renovation and rehabilitation plans to remediate the condition of the winery roof, walls, support beams, drainage, electrical and plumbing systems, floors and wine tanks.

217.     In response to the Reboredo evaluation, Leandro, Juan Pablo, and Irusta falsely represented to Ehrman that they intended to engage Reboredo to undertake the remediation and later falsely informed Ehrman that they had done so.  Instead of executing Reboredo's tightly analyzed, competently planned and realistically budgeted improvement plan, Leandro, Juan Pablo and Irusta engaged Mario Doña ("Doña") to do the work intended for Reboredo.  Dona was an incompetent contractor and a confederate of Irusta who falsely held himself out as a licensed civil engineer, from whom the Maifredini Defendants received fraudulent kickbacks in connection with the winery's remediation.  All the work performed by Doña was of such inferior quality that it

contributed to the physical degradation of the winery's physical plant, and served simply as a means by which the Defendants extracted kickbacks for their own benefit.  Indeed, all the work performed by Dona at the Maifredinis' direction proved to be ultimately worthless or of such sub-standard quality that it exacerbated the condition of the winery The alleged work undertaken by Doña with Irusta's complicity bore no relation to the structural needs identified by Reboredo and which remained un-remediated.

218.    From time to time Ehrman inquired about the progress of the work.  In response, Defendants Juan Pablo, Leandro, and Irusta falsely informed Ehrman that the work was going well with Reboredo.

219.    At all times, Leandro, Juan Pablo and Irusta were aware of the substandard quality of Dona's work and ordered the winery employees to say nothing to Ehrman about the true state of the remediation progress.

220.    The Defendants also falsely informed Ehrman that they were paying for the remedial work out of Viña Maipú's positive cash flow when in fact they were paying Doña out of the proceeds of fraudulent bank loans they had negotiated using the Ehrman powers of attorney.

221.    As a result of the fraudulent remediation scheme, the Defendants not only defrauded Viña Maipú of substantial sums of money but also so neglected the physical plant that the winery's physical condition reached the brink of ruination and remediation costs were trebled.

### Fraudulent Purchase of Winery Supplies and Equipment:

222.    In furtherance of their scheme and conspiracy to defraud the Plaintiffs, the Defendants, starting in mid-March 2006 and continuing through September 2007,

exploited their control over the winery by purchasing with winery funds supplies and equipment at artificially elevated prices from confederates from whom they then obtained fraudulent kickbacks.

223.    In or about June 2007, Leandro, Juan Pablo and Irusta conspired to defraud Ehrman and the winery in connection with the installation of a new shed and concrete floor.  In furtherance of that particular scheme, Leandro, Juan Pablo and Irusta solicited and received a price quotation from a contractor to purchase and install a shed at Viña Maipú for 78,000 pesos.  They then directed that the contractor increase his price to over 150,000 pesos so that they could divert the additional 72,000 pesos to themselves. Additionally Defendants directed that the contractor falsely state that he would be installing a new shed, priced accordingly, when in fact, the building they arranged to have installed was second hand.  Although the contractor originally quoted a price which included a new concrete floor, the Defendants directed that the contractor quote a separate and higher price for installation of the concrete floor by Doña, from whom they intended to receive a corresponding kickback.

224.    In or about January 2007, using Viña Maipú funds, the Defendants purchased a hydraulic grape press from Doña, for which they paid an artificially inflated price, paid with a loan in Euros, the use of which advantaged the Defendants at Ehrman's expense because of existing inflationary trends.  The Defendants then received additional financial benefits in the form of kickback payments from the seller.  The grape press was not only unnecessary, it was entirely unsuited to Viña Maipú's needs, as it was extremely expensive, fragile, too small in capacity, and technically inadequate.  The Defendants made the purchase knowingly and fraudulently as they undertook the transaction over the

objections of the winery's oenologist, Sr. Ramón Salvatierra, the winery's bookkeeper

José Zambudio, and the former owner, and now consultant to the winery, Carlos Aranda.

Defendants also sold at substantially below market value the previous, functional wine

press, which had just been entirely retrofitted and renovated, and which was more

suitable for the winery's business than the newer, more expensive model.

225.    During the same period, again using Viña Maipú funds, the Defendants

purchased Nextel cell phone equipment and subscription accounts for themselves and

Polibol that were unrelated to and unjustified by winery needs or purposes.

### Fraudulent Representations of Profitability:

226.    Ehrman repeatedly queried Defendants whether the prices were adequate

to support continuing sales (i.e., were the prices above marginal cost of production, etc).

In response, Defendants repeatedly and falsely assured Ehrman that Viña Maipú was

operating profitably and that sales prices supported a gross margin of well over thirty-five

percent.  In fact sales prices were inadequate to produce any positive gross margin at all,

and were maintained at this level in order to improve and promote Defendants' fraudulent

fees and kickbacks.

### Misappropriation of Checks and Monies:

227.    In furtherance of their scheme to defraud the Plaintiffs, the defendant

Irusta regularly misappropriated and converted third party checks payable to Viña Maipú

in payment of accounts receivable, claiming he was depositing the same in Viña Maipú's

bank accounts.  Irusta did so without listing or accounting for such checks in order to

conceal the misappropriations from the Plaintiffs, and instead cashed them and converted

the funds to his own use and that of the other Defendants in amounts in excess of 30,000 pesos.

### Fraudulent Bank Loans and Indebtedness:

228.    The Maifredinis and Irusta used their powers of attorney to arrange for bank loans in the name of Viña Maipú, doing so without Ehrman's authorization or knowledge, concealed the loans from Ehrman, and then diverted, converted and applied the loan proceeds for their own use and to purposes unrelated to Viña Maipú business. By November 2007, the Defendants had burdened Viña Maipú with indebtedness in excess of the equivalent of $160,000 USD.

229.    In addition, the Defendants deliberately failed to pay the winery's legitimate operational expenses as they became due and specifically instructed Viña Maipú's employees not to keep such records and to conceal from Ehrman and his representatives anything about such matters, on pain of immediate removal. Instead, the Defendants issued a series of "unfunded checks" to pay the winery's accounts payable for which inadequate funds were on deposit, thus further exacerbating the winery's indebtedness. In order to conceal the mounting debt from Ehrman, they deliberately failed to keep a record of such unfunded checks. From March 2006 through September 2007, Defendants issued unfunded checks in excess of 500,000 pesos, then equivalent to approximately $170,000 USD.

**Fraudulent Concealment of Viña Maipú Fraud:**

**The Defendants Leandro, Juan Pablo, and Irusta, Individually and as Agents of Polibol, Ensured an Absence of Financial Controls and Accounting Procedures in Order to Conceal Their Acts of Theft, Misappropriation and Mismanagement:**

230.    Although prior to and concomitant with the purchase, Ehrman had requested and the Maifredinis (acting on their own behalf and as agents of Polibol) promised and agreed to provide Ehrman with full and current financial reporting on Viña Maipú's activities, they had no intention of doing so, and, in fact, never did.  Once in control of Viña Maipú, they actively concealed and misrepresented Viña Maipú's financial affairs and condition, routinely sending false financial information to Ehrman via the e-mails identified in the Exhibits hereto.

231.    In breach of their contractual agreement and promises to supply Ehrman with accurate and current financial reports concerning the performance of the winery, they maintained such information but in furtherance of their fraudulent scheme, deliberately concealed from Ehrman Viña Maipú's relevant financial records including lists of checks received or deposited, current bank balances, loan balances, and inventories of supplies, equipment, actual production levels (such as wine in tanks and barrels) and inventories of bottled wine.  Instead, the Maifredinis advised Ehrman that such data was in preparation but not yet available, thereby concealing from him the actual financial condition, status and performance of the winery.

232.    Defendants failed to provide  prepare or cause to be prepared any budgets or operating plans, sales estimates or projections, operating documents for calculating or projecting required purchases of grapes, bottles, corks, labels and other supplies and raw materials necessary for the production of wine.  They failed to create or cause to be

created projections or analyses for control of costs, cash flow, recording of indebtedness, recording and analysis of cash receipts, aged accounts receivable, or other routine accounting, bookkeeping, and operating documents.

233.    Not only did the Defendants deliberately conceal from Ehrman records of deposits, expense checks, and account balances, they instructed the winery's accountant not to contact Ehrman at all and to refrain from revealing to Ehrman the existence of such information.

234.    These actions and Defendants' failure to properly register Viña Maipú as an asset belonging to Ehrman with Argentine National, State and Local tax and other authorities has caused Ehrman to incur penalties, fines, and a risk of criminal prosecution and attendant stress, worry and anxiety.

235.    Not only did the Defendants fail to disclose to Ehrman accurate records concerning the winery's accounts receivable, they failed to take reasonable measures to collect unpaid obligations due to Viña Maipú.  By the end of 2007, accounts receivable had ballooned to over $300,000 pesos because the Defendants had made no attempt collect amounts due.

236.    The Defendants deliberately circumvented the internal system of registering all payments received by the winery and concealed many such payments from Ehrman.  Instead, they turned many such payment checks over to Irusta, who, instead of depositing and accounting for these payments, converted at least 30,000 pesos in such payments to his own use and that of the other Defendants.

237.    Notwithstanding the foregoing, the Defendants consistently and falsely informed Ehrman that they were in the process of instituting financial controls and

accounting measures but that the winery staff was incompetent and frustrating their efforts.  In fact, the winery staff was alarmed at the incidence of malfeasance and wanted to notify Ehrman of their concerns but Irusta, Leandro and Juan Pablo threatened them with immediate termination if they contacted Ehrman or disclosed to him or his associates the true state of winery affairs.  In this way the Defendants succeeded in concealing their acts of fraud and neglect until early 2008 when several witnesses came forward.

### Fraudulent Reporting and Direct Acts of Concealment:

238.    In furtherance of their attempts at concealment, Defendants withheld from Ehrman repeated reports made to Leandro and Juan Pablo by Carlos Aranda , Viña Maipú's prior owner and then advisor, in which Aranda warned that Irusta was incapable of managing Viña Maipú properly and was getting the business in financial trouble.

239.    Leandro, Juan Pablo and Irusta actively withheld from Ehrman accurate management reports prepared by the operations staff and expressly instructed employees at Viña Maipú,  including, but not limited to, the bookkeeper / accountant José Zambudio, director of sales Ivan Ivulich, winemaker Ramón Salvatierra, secretary Mariela Kurlat, and Carlos Aranda, not to communicate to Ehrman any financial information, especially negative information which would raise his concern or suspicion about the economic prospects of Viña Maipú.  Leandro, Juan Pablo and Irusta threatened employees with immediate dismissal if they disobeyed those instructions.

240.    At the same time, the Defendants withheld and refused to transmit many original reports to Ehrman, actively "revised" and falsified a number of financial reports and projections that they received from Viña Maipú staff, both during the due diligence

period and after the purchase of Viña Maipú, and sent revised and falsified reports to Ehrman by electronic mail and the United States postal system in order to portray Viña Maipú in a falsely positive light.  Initially, they were aided in this effort by Carlos Aranda, the former owner, who was retained as a consultant to assist in the transition of ownership.

241.    At all times relevant throughout 2006 and 2007, in numerous electronic mail messages and attachments, many of which are included in **Exhibits Categories A - G**, and interstate and international phone calls to Ehrman, Leandro falsely reported that the Viña Maipú businesses had become profitable, that sales and profits were being made at profitable prices and were advancing well, that Viña Maipú maintenance and operations were proceeding well, and that the winery building was in good shape.

242.    In fact, Defendants were ignoring the true pressing needs of the physical plant to the detriment of the structure and the safety of employees, and they were concealing from Ehrman the progressive deterioration of the winery's physical structure. All such reports to Ehrman from the Defendants were contrary to fact and contrary to the reports and electronic messages only subsequently sent to Ehrman by the bookkeeper, oenologist, and sales manager during investigation of these circumstances once the mismanagement and later the fraud was discovered as set forth herein.

243.    In addition to their conspiracy to defraud the Plaintiffs, the Maifredinis agreed and conspired to attract additional investors to Argentina for purposes of defrauding them in addition to the Plaintiffs.  In furtherance of their scheme to defraud others, between April 2006 and September 2007, the Defendants fabricated and sent to Ehrman via electronic mail numerous false financial reports concerning Viña Maipú

operations for purposes of securing additional investments from Ehrman and Ehrman's friends.  The Defendants falsely stated in one such report that they had cut costs by over $75,000 USD in less than three months because of their efforts.  In an electronic message dated April 3, 2006, the Defendants falsely claimed a 17 percent reduction in cost of making wine due to Defendants' alleged refined business practices.  In the course of such communications, the Defendants falsely claimed that Viña Maipú was profitable, that problems with the physical plant had been addressed, that improvements had been made in the bookkeeping and accounting systems, and that they and Polibol were responsible for these "improvements."

244.    During the period June 2006 through November 2007, Defendants Leandro, Juan Pablo and Polibol, seeking new investors as additional sources of capital to fund their conspiracy, contacted American investment bankers and private investors, claiming that Viña Maipú was currently profitable, was a huge success story, and fairly and accurately demonstrated defendants Leandro, Juan Pablo, Irusta and Polibol's abilities to successfully manage wineries in Argentina.

### Continued Acts of Concealment from Discovery:

245.    In the Fall of 2007, Ehrman engaged the services of a Spanish speaking management consultant, José Portuondo ("Portuondo"), to visit and assist in developing and managing Viña Maipú.

246.    Portuondo's initial investigation took several months as Leandro, Juan Pablo and Irusta actively worked to conceal from him accurate information regarding the financial affairs and condition of the winery. During the ensuing months, Leandro Maifredini, Juan Pablo Mairfredini, Romulo Maifredini and Oscar Irusta ostensibly

continued to carry out their functions of managing the winery through late 2007 and throughout 2007 purported to cooperate with Portuondo's efforts to analyze the financial status of the winery.  Instead, the Maifredini defendants actively concealed and withheld necessary and relevant information regarding the winery's performance, yet all the while, falsely promised and assured Portuondo that they would come forward with the relevant information, but never delivering on such promises.

247.     In or about October, 2007, Viña Maipu informed Irusta that his services were no longer required.  In furtherance of the fraudulent scheme and in a continuing attempt to conceal the true facts concerning the affairs of the winery, Irusta filed a meritless law suit against the winery alleging that his dismissal was unjustified.  On information and belief, he is supported in that claim by the Maifredini defendants in an effort to further extort the Plaintiffs of money and property.

248.     Leandro Maifredini, Juan Pablo Maifredini  and Romulo Maifredini continued their ostensible association with the winery through 2007 and continued to instruct the winery staff to conceal any and all information from Ehrman and Portuondo.

249.     In furtherance of their efforts to conceal relevant information concerning the financial affairs of the winery, Leandro removed an Apple laptop computer from the winery which contained financial information concerning the winery, Casa Villa Elisa and Casa Araucarias.  Portuondo made several attempts to recover the computer from Leandro who promised to return it.  In November, 2007, Portuondo dispatched Ivan Ivulich to Polibol offices in La Plata to retrieve the laptop computer and a Blackberry Ehrman had loaned to Leandro.  In the Polibol offices, Romulo confronted Ivulich and stated that the laptop was a gift from Ehrman and refused to relinquish it.  He also told

Ivulich that, if Portuondo came to Polibol, Romulo would harm him physically.  He also stated to Ivulich that, if Ehrman refused to pay outstanding bills from Polibol, he would retaliate against Ehrman.

250.    In that same month, Romulo Maifredini continued to insist to Ehrman that he pay the Maifredinis for the services they allegedly supplied to Ehrman and his business ventures and threatened Ehrman with physical harm if he refused to make payment.

251.    As a consequence of the Maifredinis and Irusta's acts of concealment and obfuscation, the fraudulent conduct of the defendants in connection with Viña Maipu as set forth herein did not become apparent to Ehrman until other winery employees came forward in or about January, 2008.  The true nature of their fraudulent scheme with respect to the investments Ehrman made in Casa Villa Elisa and Araucarias did not become evident until months thereafter.

### Viña Maipú Damages:

252.    During the period of March 2006 through November 2007, the Maifredinis, Irusta and Polibol increased Viña Maipú's bank indebtedness to more than $1,200,000 pesos, or approximately $400,000 USD.

253.    Through deliberate mismanagement and neglect, the Defendants caused the winery's physical condition to fall into substantial disrepair and destruction as previously alleged.  The full costs of remediation are as yet undetermined, but are estimated to be in excess of $1,600,000 pesos, or more than $400,000 USD.

254.    The extent of the Defendants' corruption and theft of Viña Maipú funds, property and other assets are estimated to be in excess of one million dollars, and in amounts to be determined in the course of discovery.

# CAUSES OF ACTION

## COUNT I --RICO, 18 USC § 1962(c) – ASSOCIATION IN FACT

**(Defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, Leandro de La Fuente, Mara Martin, Polibol and Oscar Irusta)**

255.    The Plaintiffs incorporate by reference and re-aver the allegations contained in each of the preceding paragraphs of this Complaint as they are numbered 1 – 254 (hereinafter the "factual allegations").

256.    Each Plaintiff is a "person" within the meaning of RICO, 18 USC §§1961(3) and 1964(c).

257.    This Count is against Defendants Mara Martin, Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, Leandro de La Fuente, Oscar Irusta and Polibol (the "Count I Defendants").

258.    At all relevant times, each of the Defendants Mara Martin, Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, and Oscar Irusta are each "persons" within the meaning of 18 USC §1961(3).

259.    At all relevant times, The Defendant Polibol, SA was a person within the meaning of 18 USC § 1961 (3).

260.    At all relevant times, the Count I Defendants formed an association-in-fact for the purpose of executing the Fraudulent Scheme and by which they defrauded the Plaintiffs as set forth herein.  The association-in-fact constituted an "enterprise" within the meaning of RICO, 18 USC §1961(4).

261.    At all times relevant, the Count I Defendants were employed by or associated with the enterprise.

262.    At all times relevant, the foregoing enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of RICO, 18 USC § 1962(c).

263.    The Count I Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity, to wit, wire fraud in violation of 18 USC §1343 as set forth throughout the factual allegations and in Exhibits A through O, in furtherance of the unlawful scheme as herein alleged for the unlawful purpose of intentionally defrauding the Plaintiffs and other targets.

264.    In summary:

(a)     **Mara Martin**: During the period from April 2004 through 2007, Martin, as more particularly described in the factual allegations, repeatedly solicited Ehrman by means of and through wire communications in  the form of e-mail transmissions as set forth in Exhibits G and H, through which she urged Ehrman to make financial investments in Argentina with and based upon her advice and assistance and with that of the other Count I Defendants with whom she conspired.

(b)     **Leandro Maifredini**:  In summary, and as more particularly set forth in the factual allegations, during the period from no later than the beginning of 2005  through November 2007, Leandro, engaged Ehrman in numerous communications via international telephone calls, electronic mail exchanges as set forth in Exhibits A and B and face-to-face meetings, by means of which he, in concert with the other Maifredini defendants, fraudulently induced Ehrman to assent to and fund the formation of MAIEHR and Esadet, the purchase of Casa Villa Elisa, Casa Abril CC24

Araucarias and Viña Maipu, wire transfer funds in interstate and foreign commerce to fund the purchase and operation of such business ventures, usurped control of the ventures, converted money and property to his own use and thereby defrauded Ehrman of the proceeds thereof.

(c)     **<u>Juan Pablo Maifredini</u>**  In summary, and as more particularly set forth in the factual allegations, during the period from no later than the beginning of 2005  through November 2007, Juan Pablo, also engaged Ehrman in numerous communications via international telephone calls, electronic mail exchanges as set forth in Exhibits C and D, and face-to-face meetings, by means of which he, in league with the other Maifredini defendants, fraudulently induced Ehrman to assent to and fund the formation of MAIEHR and Esadet, the purchase of Casa Villa Elisa, Casa Abril CC24 Araucarias and Viña Maipu, wire transfer funds in interstate and foreign commerce to fund the purchase and operation of such business ventures, usurped control of the ventures, converted money and property to his own use and thereby defrauded Ehrman of the proceeds thereof.

(d)     **<u>Leandro de la Fuente</u>**:  In summary, and as more particularly set forth in the factual allegations, during the period from no later than the beginning of 2005  through November 2007, de la Fuente also engaged Ehrman in numerous communications via international telephone calls, electronic mail exchanges as set forth in Exhibits E and F, and face-to-face meetings, by means of which he, in league with the Maifredini defendants, fraudulently induced Ehrman to assent to and fund the formation of MAIEHR and Esadet, the purchase of Casa Villa Elisa, Casa Abril CC24 Araucarias and Viña Maipu, wire transfer funds in interstate and foreign commerce to fund the purchase and operation of such business ventures, usurped control of the ventures, converted money and property to his own use and thereby defrauded Ehrman of the proceeds thereof.  De la Fuente directly managed and executed the scheme related to Casa Abril CC 24 Araucarias as described in the factual allegations.

(e)     **Oscar Irusta:**  In summary and as more specifically alleged in the factual allegations, Irusta assumed day-to-day control over Viña Maipu under the overall direction of the Maifredini defendants, and, as the confidante and co-conspirator in the fraudulent scheme, misappropriated money, property and corporate opportunities, directed business to his friends, took kickbacks, falsified financial reports and remediation reports, and did the bidding of Leandro, Juan Pablo and de la Fuente.  In furtherance of the fraudulent scheme, Irusta transmitted e-mail messages in foreign and interstate commerce as set forth in Exhibits I and J in furtherance of the fraudulent scheme and did so as late as November, 2007, in a deliberate attempt to conceal the fraudulent scheme from detection by Ehrman and Portuondo.

(f)     **Romulo Maifredini:**  In summary, as more particularly described in the factual allegations, Romulo served as a senior executive and manager of Polibol and participated in the extent to which Polibol's resources were employed in the fraudulent scheme.  Romulo was the direct personal recipient of a number of the international wire transfers initiated by Ehrman, as set forth in **Exhibit I**, and personally threatened Ehrman in November, 2007 when Ehrman indicated that he would no longer pay the Maifredinis and Polibol for "expenses" they claimed to have incurred on behalf of the Plaintiffs.

(g)     **Polibol**:  In summary and as more particularly set forth in the factual allegations, at all times, the Maifredini family members were high ranking and controlling executive employees of Polibol for which they acted on its behalf as employees and agents who acted with actual or apparent authority and within the scope of their authority and employment by Polibol.  In the course thereof, the Maifredini defendants employed the offices and other resources of Polibol to purport to manage and safeguard

the financial affairs of the Plaintiffs' Argentine investments, used Polibol employees to prepare and distribute false financial information about the status of the Plaintiffs' financial investments, and used Polibol's e-mail facilities to transmit the communications set forth in **Exhibits G-1, G-2 and G-3** in furtherance of the fraudulent scheme.  The Maifredinis conducted or participated, directly or indirectly, in the conduct of Polibol's affairs through creation of the website 'micharter.com.ar' providing fraudulent information to Ehrman by wire and repeatedly updating the website on a monthly basis in a pattern of racketeering activity, as described in more detail above in the factual allegations.

265.     The Count I Defendants have directly and indirectly conducted and participated in the conduct of the enterprise established by the association in fact, by engaging in and perpetrating an extensive "pattern of racketeering activity" as alleged in the factual allegations and in **Exhibit Categories A through K**, in violation of 18 USC § 1443 and within the meaning of 18 U.S.C. § 1961(5).

266.     The acts as alleged constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5) because the acts were related to each other by virtue of common participants, common victims, the Plaintiffs, common targets, a common method of commission through solicitation and inducement of the trust and confidence of their intended targets, including but not limited to the Plaintiffs, and a common purpose and result of defrauding the Plaintiffs of money and property.

267.     As a direct and proximate result of the Count I Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in that they were defrauded of their investments in amounts in

excess of two million dollars, as set forth in the factual allegations and as yet to be fully determined by a court or jury.

WHEREFORE, the Plaintiffs request that this Court enter judgment against the Count I Defendants, jointly and severally, as follows:

(a)     Award Viña Maipu an amount to be determined by a court or jury, as payment for losses incurred as a result of the Count I Defendants' conduct;

(b)     Award Ehrman an amount to be determined by a court or jury, as payment for losses incurred as a result of the Count I Defendants' conduct;

(c)     Award Viñas Argentinas an amount to be determined by a court or jury, as payment for losses incurred as a result of the Count I Defendants' conduct; and

(d)     Pursuant to 18 USC § 1964(c), award the Plaintiffs threefold their damages, plus costs and attorneys fees.

(e)     Grant such further relief as the Court determines to be just and equitable.

## COUNT II --  RICO, 18 USC § 1962(c) – VIÑA MAIPU

**(Defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, Polibol and Oscar Irusta)**

268.     Plaintiffs incorporate by reference and re-aver the allegations contained in each of the preceding paragraphs of this Complaint as they are numbered 1 through 267 (hereinafter, the "factual allegations").

269.     This Count is against Defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, Oscar Irusta and Polibol (the "Count II Defendants").

270.     Viña Maipu makes wine and, at all times relevant, both prior to and after its acquisition by Ehrman and Viñas Argentinas, sold and distributed wine in a number of

countries foreign to Argentina, including, but not limited to the United States.

Accordingly, at all times material hereto, Viña Maipu was and is an enterprise engaged in

or whose activities affect interstate or foreign commerce within the meaning of 18 USC §

1962(c).

271.     At all times material hereto and in furtherance of the Fraudulent Scheme

defrauding the Plaintiffs and other potential foreign investors, the Count II Defendants

were associated with Viña Maipu and conspired to and did conduct and participate in the

conduct of Viña Maipu's affairs through a pattern of racketeering activity, to wit, wire

fraud in violation of 18 USC § 1343, by transmitting electronic mail messages and

attachments as set forth in the factual allegations and in **Exhibits Categories A through**

**K.**

272.     More specifically,

(a)     <u>**Leandro Maifredini**</u>:  In summary, and as set forth in the factual
allegations hereof, in e-mail messages as identified in **Exhibits B-1 and
B-2**, in international and interstate phone calls and text messages, and in
face-to face meetings with Ehrman in Massachusetts in 2005 and 2006,
and in furtherance of the fraudulent scheme, Leandro induced Ehrman and
the Plaintiffs to purchase Viña Maipu based on false and misleading
information regarding his, his confederates' and Polibol's management
skills and experience in the wine industry, Viña Maipu's historical
financial information, purported due diligence and analysis, and on his
false claims that he had negotiated a reduction in the asking price.
Leandro thereafter assumed a dominant role in managing the affairs of the
winery, participated in the selection of Oscar Irusta as the Maifredini's
dupe and instrument of day-to-day management, colluded with the other
Count II Defendants to convert Viña Maipu assets to their own use and
that of Polibol, ran up huge indebtedness on behalf of Viña Maipu, and

obfuscated and concealed the facts from Ehrman through no earlier than November, 2007.

(b)   **Juan Pablo Maifredini:**  In summary, Juan Pablo engaged in the very activities attributed to Leandro Maifredini in the foregoing paragraph, in furtherance of the fraudulent scheme, transmitted e-mail messages identified and described in **Exhibits E and F**, held himself out as and purported to fulfill the duties of Vice President of Viña Maipú and sent out multiple electronic mail messages through the Internet using that title.

(c)   **Oscar Irusta:**  In summary and as more specifically alleged in the factual allegations, Irusta assumed day-to-day control over Viña Maipu under the overall direction of the Maifredini defendants, and, as the confidante and co-conspirator in the fraudulent scheme, misappropriated money, property and corporate opportunities, directed business to his friends, took kickbacks, falsified financial reports and remediation reports, and did the bidding of Leandro, Juan Pablo and Polibol.  In furtherance of the fraudulent scheme, Irusta transmitted e-mail messages in foreign and interstate commerce as set forth in **Exhibits F-2 and F-2** in furtherance of the fraudulent scheme and did so as late as November, 2007, in a deliberate attempt to conceal the fraudulent scheme from detection by Ehrman and Portuondo.

(d)   **Romulo Maifredini**:  In summary, as more particularly described in the factual allegations, Romulo served as a senior executive and manager of Polibol and participated in the extent to which Polibol's resources were employed in the fraudulent scheme.  Romulo was the direct personal recipient of a number of the international wire transfers initiated by Ehrman, as set forth in **Exhibit I**, and personally threatened Ehrman in November, 2007 when Ehrman indicated that he would no longer pay the Maifredinis and Polibol for "expenses" they claimed to have incurred on behalf of the Plaintiffs.  As the senior member of the Maifredini family in

control of Polibol, Romulo caused Polibol employees and agents to engage in the conduct set forth herein and to transmit the e-mail messages set forth in **Exhibits G-1, G-2 and G-3.**

(e)  **Polibol:**  In summary and as more particularly set forth in the factual allegations, at all times, the Maifredini family members were high ranking and controlling executive employees of Polibol for which they acted on its behalf as employees and agents who acted with actual or apparent authority and within the scope of their authority and employment by Polibol.  In the course thereof, the Maifredini defendants employed the resources of Polibol to purport to manage the financial affairs of Viña Maipu, used Polibol employees to prepare and distribute false financial information about the status of Viña Maipu's financial investments, and used Polibol's e-mail facilities to transmit the communications set forth in **Exhibits G-1, G-2 and G-3** in furtherance of the fraudulent scheme.  The Maifredinis employed Polibol employees, office facilities, and other resources to create and maintain the website 'micharter.com.ar" providing fraudulent information to Plaintiffs about Viña Maipu's financial affairs and thereby concealing the true facts in connection therewith.  Ehrman by wire and repeatedly updating the website on a monthly basis in a pattern of racketeering activity, as described in more detail above in the factual allegations.  The Count II Defendants misappropriated Viña Maipu product inventories and other business opportunities, fraudulently invoiced Viña Maipu and Ehrman for fictitious expenses and actual Polibol expenses (for example, labels, international marketing, business trips, business expenses as detailed in the factual allegation section of the Complaint) for the financial benefit of Polibol. Polibol, thereby, shared in the fruits of the fraudulent scheme, particularly as it related to Viña Maipu.  Polibol inappropriately charged or overcharged Viña Maipu for services expenses on numerous occasions in amounts yet to be fully determined.

273.    WHEREFORE, the Plaintiffs request that this Court enter judgment against the Count II Defendants, jointly and severally, as follows:

(a)    Award Viña Maipu an amount to be determined by a court or jury, as payment for losses incurred as a result of the Count II Defendants' conduct;

(b)    Award Ehrman an amount to be determined by a court or jury, as payment for losses incurred as a result of the Count II Defendants' conduct;

(c)    Award Viñas Argentinas an amount to be determined by a court or jury, as payment for losses incurred as a result of the Count II Defendants' conduct; and

(d)    Pursuant to 18 USC § 1964(c), award the Plaintiffs threefold their damages, plus costs and attorneys fees.

(e)    Grant such further relief as the Court determines to be just and equitable.

## COUNT III - RICO, 18 USC § 1962(b) – VIÑA MAIPU

**(Defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, Polibol and Oscar Irusta)**

274.    Plaintiffs incorporate by reference and re-aver the allegations contained in all preceding paragraphs 1 through 273 of this Complaint.

275.    This Count is against Defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, and Irusta (the "Count III Defendants").

276.    Viña Maipu is an enterprise engaged in and whose activities affect interstate commerce.

277.    As set forth in the factual allegations, the Count III Defendants, directly or indirectly, acquired and maintained control of Viña Maipu through a pattern of

racketeering activity, to wit, wire fraud in violation of 18 USC § 1343, in violation of 18

USC § 1962(b)

278.    As a direct and proximate result of the Count III Defendants' racketeering

activities and violations of 18 U.S.C. § 1962(b), Plaintiffs have been injured in their

business and property in that, as fully stated in paragraphs herein, the Plaintiffs suffered

losses of and depreciation of their investment as a result of (1) a deterioration of the

physical condition of the wineries infrastructure, (2) monetary losses caused by

Defendants' involvement in kickbacks, misappropriation of funds, wine inventories, false

expenses, false billing, excess compensation, and other self-dealing, (3) increased bank

indebtedness in the amount of $170,000 and (4) the diversion and theft of capital

contributions made by Ehrman to Viña Maipu.

279.    As a consequence of the foregoing, the Plaintiffs, individually and

collectively, suffered substantial injury to their business and property within the meaning

of 18 USC § 1964(c), as they were individually and collectively defrauded of amounts in

excess of two million dollars, in amounts to be determined by a court or jury.

280.    WHEREFORE, Plaintiffs requests that this Court enter judgment against

the Count III Defendants, jointly and severally, as follows:

(a)     Award Viña Maipu an amount to be determined by a court or jury, as

        payment for losses incurred as a result of the Count III Defendants'

        conduct;

(b)     Award Ehrman an amount to be determined by a court or jury, as payment

        for losses incurred as a result of the Count III Defendants' conduct;

(c)     Award Viñas Argentinas an amount to be determined by a court or jury, as payment for losses incurred as a result of the Count III Defendants' conduct; and

(d)     Pursuant to 18 USC § 1964(c), award the Plaintiffs threefold their damages, plus costs and attorneys fees.

(e)     Grant such further relief as the Court determines to be just and equitable.

## COUNT IV - RICO, 18 USC § 1962(b) – ESADET/MAIEHR

**(Defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, Leandro de La Fuente, Mara Martin, Polibol and Oscar Irusta)**

281.    Plaintiffs incorporate by reference and re-aver the allegations contained in all preceding paragraphs 1 through 280 of this Complaint.

282.    Count IV Count is against Defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, and Irusta (the "Count IV Defendants").

283.    MAIEHR and Esadet are enterprises engaged in and whose activities affect interstate commerce in that they were created by the Defendants as vehicles through which to attract foreign investors on whose behalf they were intended to hold and manage international investments in Argentine real estate developments.

284.    As set forth in the factual allegations, the Count IV Defendants, directly or indirectly, acquired and maintained an interest in or control over Esadet and/or MAIEHR through a pattern of racketeering activity, to wit, wire fraud in violation of 18 USC § 1343, all in violation of 18 USC § 1962(b).

285.    As a direct and proximate result of the Count IV Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff Ehrman has been injured in his business and property in that, as more fully stated herein, Plaintiff Ehrman suffered losses

of and depreciation of his investments in Casa Villa Elisa and Casa Araucarias as a result of the actions and conduct of the Defendants.

286.     As a consequence of the foregoing, Ehrman has suffered substantial injury to his business and property within the meaning of 18 USC § 1964(c), as he was defrauded of money and property in amounts to be determined by a court or jury.

287.     WHEREFORE, Plaintiffs requests that this Court enter judgment against the Count IV Defendants, jointly and severally, as follows:

(a)     Award Ehrman damages in an amount to be determined by a court or jury, as payment for losses resulting from the Count IV Defendants' conduct;

(b)     Pursuant to 18 USC § 1964(c), award Ehrman threefold his damages, plus costs and attorneys fees.

(c)     Grant such further relief as the Court determines to be just and equitable.

## COUNT V - RICO, 18 USC § 1962(D)

**(Defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, Leandro de La Fuente, Mara Martin, Polibol and Oscar Irusta)**

288.     Plaintiffs incorporate by reference and re-aver the allegations contained in all paragraphs 1 through 288 of this Complaint.

289.     This count is against Defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, Leandro de La Fuente, Polibol, Mara Martin and Oscar Irusta (the "Count V Defendants").

290.     Each of the defendants is a person within the meaning of 18 USC §1962(d).

291.     As set forth herein, each of the Count V Defendants agreed and conspired with one another to violate the provisions of 18 USC § 1962(b) or 18 USC § 1962(c) by

engaging in the acts as set forth in the factual allegations and in the conduct as alleged in Counts I, II, III, and IV hereof.

292.    More particularly, each of the Count V defendants conspired (1) to engage in a pattern of racketeering activity, to wit wire fraud, as herein alleged and (2) conspired to acquire or maintain interests in or control over an enterprise engaged in or whose activities affect interstate or foreign commerce or, as persons employed by or associated with an enterprise engaged in or the activities of which affect, interstate or foreign commerce, conspired to conduct or participate, directly or indirectly, to conduct or participate, in the conduct of such a pattern of racketeering activity.

293.    That conduct constitutes a conspiracy to violate 18 USC § 1962(b) and/or 18 USC § 1962(c), in violation of 18 U.S.C. § 1962(d).

294.    As a direct and proximate result of the conspiracy by and among the Count V Defendants, the overt acts taken in furtherance of that conspiracy, and the violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property in that Plaintiffs were defrauded of their money and property as set forth in the factual allegations hereof.

WHEREFORE, Plaintiffs request that this Court enter judgment against the Count V Defendants, jointly and severally, as follows:

(a)     Award each of the Plaintiffs damages in an amount to be determined by a court or jury, as payment for losses resulting from the actions and conduct of the Count V Defendants;

(b)     Pursuant to 18 USC § 1964(c), award the Plaintiffs threefold their damages plus costs and attorneys fees.

(c)     Grant such further relief as the Court determines to be just and equitable.

## COUNT VI - FRAUD AND DECEIT

**(Defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, Leandro de La Fuente, Mara Martin, Polibol and Oscar Irusta)**

295.    Plaintiffs incorporate by reference and re-aver the allegations contained in all preceding paragraphs of this Complaint.

296.    As set forth herein, Defendants made numerous false statements of material fact to the Plaintiffs, knowing of their falsity and with the intent that Plaintiffs would rely upon these fraudulent statements.  Defendants further concealed material facts from the Plaintiffs, with the intention that Plaintiffs would act in reliance upon these omissions.  Plaintiffs relied upon Defendants' fraudulent statements and fraudulent omissions of fact, to their detriment and without any knowledge of the falsity of Defendants' statements or of Defendants' concealment of material facts.

297.    By reason of facts set forth herein, the Defendants are jointly and severally liable for defrauding the Plaintiffs of their money and property causing them substantial damages in such amounts as may be determined by a court or jury.

## COUNT VII – CONVERSION

**(Defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, Leandro de La Fuente, Mara Martin, Polibol and Oscar Irusta)**

298.    Plaintiffs incorporate by reference and re-aver the allegations contained in all preceding paragraphs of this Complaint.

299.    The Defendants are jointly and severally liable for having undertaken the actions set forth herein with the intention and effect of converting the Plaintiffs property to their own use, thereby causing the Plaintiffs substantial damages in such amount as may be determined by a court or jury.

## COUNT VIII - BREACH OF CONTRACT

**(Defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, Leandro de La Fuente, Mara Martin, Polibol and Oscar Irusta)**

300.    Plaintiffs incorporate by reference and re-aver the allegations contained in all preceding paragraphs of this Complaint.

301.    By the actions set forth herein, the Defendants, individually, and collectively, breached their promises, agreements and contractual obligations with and to the Plaintiffs, including their obligations and promises to safeguard Plaintiffs' interests, manage Plaintiffs' investments prudently and competently, provide accurate and timely reports of the status of such investments, comply with applicable United States and Argentine National, State and Local tax and other laws, refrain from charging and receiving fees and commissions other than as expressly agreed upon with Ehrman, convey to Ehrman documents evidencing his title to Casa Villa Elisa and fulfilling their undertakings with respect to all such investments pursuant to the Defendants' Agreement with Ehrman.

302.    As a consequence of the foregoing, the Plaintiffs suffered damages in such amounts as may be determined by a court or jury.

## COUNT IX  - BREACH OF FIDUCIARY DUTY

**(Defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, Leandro de La Fuente, Polibol, Mara Martin and Oscar Irusta)**

303.    Plaintiffs incorporate by reference and re-aver the allegations contained in all preceding paragraphs of this Complaint.

304.    By reason of facts set forth herein, the Defendants at all times relevant owed the Plaintiffs a fiduciary duty of good faith which, by their conduct, they breached causing substantial damages in such amounts as may be determined by a court or jury.

## COUNT X - UNJUST ENRICHMENT

**(Defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, Leandro de La Fuente, Polibol, Mara Martin and Oscar Irusta)**

305.    Plaintiffs incorporate by reference and re-aver the allegations contained in all preceding paragraphs of this Complaint.

306.    By reason of facts set forth herein, the Defendants were unjustly enriched at the expense and injury of the Plaintiffs and are, therefore, each jointly and severally liable thereto for the amount of such damages in such amounts as may be determined by a court or jury.

## COUNT XI – MONEY HAD AND RECEIVED

**(Defendants Leandro Maifredini, Juan Pablo Maifredini, Romulo Maifredini, Leandro de La Fuente, Polibol, Mara Martin and Oscar Irusta)**

307.    Plaintiffs incorporate by reference and re-aver the allegations contained in all preceding paragraphs of this Complaint.

308.    As a result of the actions of the Defendants as set forth herein, the Defendants received from the Plaintiffs money and property which in equity and good

309.    PRAYERS FOR RELIEF

Plaintiffs pray for and demand the following relief:

(a)     Judgment against the Defendants jointly and severally in the amount of damages determined by a court or jury with respect to each Count of the Complaint;

(b)     With respect to Counts I through IV, an award of treble damages sustained by the Plaintiffs plus their attorneys fees and costs in prosecuting this action; and

(c)     Such further relief as the Court determines to be just and reasonable.

## JURY DEMAND

PLAINTIFFS DEMAND A JURY TRIAL ON ALL COUNTS SO TRIABLE.

**MARK L. EHRMAN, VINAS ARGENTINAS LLC, VINA MAIPU SRL PLAINTIFFS**

By their attorneys,

/S/Bruce W. Edmands_____
Bruce W. Edmands (BBO# 151360)
Charlotte L. Bednar (BBO# 657748)
Daniel A. Leonardo (BBO# 659085)
ECKERT SEAMANS CHERIN & MELLOTT
Two International Place, 16th FL
Boston, MA 02110
Tel: 617-342-6800

Date: October 29, 2010

# EXHIBIT LIST

| Exhibit No | Description |
| --- | --- |
| A-1 | Schedule of Email Addresses Used by Defendants and Number of Emails Originated from Each Address |
| A-2 | E-Mail List - Plenary - All E-Mails Transmitted by Defendants and Employees/Agents |
| B-1 | E-Mail List-Transmissions by Leandro Maifredini |
| B-2 | E-mail Contents-Transmissions by Leandro Maifredini |
| C-1 | E-Mail List-Transmissions by Juan Pablo Maifredini |
| C-2 | E-Mail Contents-Transmissions by Juan Pablo Maifredini |
| D-1 | E-Mail List-Transmissions by Leandro de la Fuente |
| D-2 | E-Mail Contents-Transmissions by Leandro de la Fuente |
| E-1 | E-MaIL List-Transmissions by Mara Martin |
| E-2 | E-Mail Contents-Transmissions by Mara Martin |
| F-1 | E-Mail List-Transmissions by Oscar Irusta |
| F-2 | E-Mail Contents-Transmissions by Oscar Irusta |
| G-1 | E-mails Transmitted from Polibol.com.ar |
| G-2 | E-Mail List-Transmissions from Polibol or Polibol/Bandex Staff Employees |
| G-3 | E-Mail Contents-Transmitted by Polibol or Polibol/Bandex Staff Employees |
| H-1 | E-Mail List-Defendants to Other Targets |
| H-2 | E-Mail Contents-Defendants' Transmissions to Other Targets |
| I | List-Wire Transmissions Initiated by Plaintiffs |
| J | Plan Inicial De Estructuracion Empresaria |
| K-1 | "Informacion Mercado Vitivinicola Y Vina Maipu, |
| K-2 | Spreadsheet - Financial Analysis - Vina Maipu |
| K-3 | Spreadsheet – Alleging 17% Production Cost Reduction |
| L | Email Thread - Donald Jackson, Jackson Wines  to/from Cynthia Acosta and Leandro Maifredini |